Russell Lee BRYANT, Movant-Appellant,

v.

STATE of Missouri, Respondent.

No. 60076.

Supreme Court of Missouri,
En Banc.

March 13, 1978.
Rehearing Denied April 10, 1978.

William G. Mays, II, Columbia, for movant-appellant.

John D. Ashcroft, Atty. Gen., Paul R. Otto, Frank J. Murphy, Asst. Attys. Gen., Jefferson City, for respondent.

BARDGETT, Judge.

Russell Lee Bryant filed a motion under Rule 27.26 to vacate the judgment and twenty-five-year sentence imposed upon him following his plea of guilty to rape. The circuit court overruled the motion and Bryant appealed to the Missouri court of appeals, Kansas City district. The court of appeals reversed the circuit court judgment and thereafter this court sustained respondent's motion to transfer filed under art. V, sec. 10, Mo.Const., as amended 1970.

The question of general interest or importance in this case is whether the trial court is *required* to, *sua sponte*, hold an evidentia-ry hearing on a defendant's mental competence to proceed to trial whenever a psychiatric report indicates the defendant is suffering from a mental disease or defect under sec. 552.010, RSMo 1969,[1] even though the report also states that the defendant understands the nature of the charges against him and he is able to cooperate with counsel in his own defense.

In *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966), the Court said, "A determination of these claims [the duty to hold a hearing re mental competence to proceed] necessitates a detailed discussion of the conduct of the trial and the evidence touching upon the question of Robinson's competence at that time [at trial]."

The allegations of movant necessitate the following detailed discussion of the proceedings before the circuit court which led to movant's conviction and imprisonment.

Movant Bryant had been charged in a two-count indictment with kidnapping and forcible rape in the circuit court of Boone county. The crimes were alleged to have occurred on August 30, 1973. Counsel was appointed and a psychiatric examination of movant was ordered by the circuit court pursuant to chapter 552 and was performed by a Dr. Philip Marco who rendered a report on January 10, 1974, and a supplementary report on February 21, 1974. The report dated January 10, 1974, stated in part:

"Course in Hospital: He adjusted well to the ward and interacted well with the other patients. He was elected president in a patient/staff meeting and functioned well. He is making plans to complete high school at Hickman High School. He was discharged December 19, 1973.

---

1. "552.010. Definition of mental disease or defect

The terms 'mental disease or defect' include congenital and traumatic mental conditions as well as disease. They do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, whether or not such abnormality may be included under mental illness, mental disease or defect in some classifications of mental abnormality or disorder. The terms 'mental disease or defect' do not include alcoholism without psychosis or drug abuse without psychosis or an abnormality manifested only by criminal sexual psychopathy as defined in section 202.700, RSMo, nor shall anything in this chapter be construed to repeal or modify the provisions of sections 202.700 to 202.770, RSMo."

Diagnosis: 1. Hysterical personality—moderately severe
2. Hysterical neurosis, dissociative type—severe
3. Marital maladjustment—moderately severe
4. Anemia secondary to folate deficiency
5. Reactive hypoglycemia—mild

Discussion:

1. Russell was informed about hypnosis being of help in recalling difficult emotional experiences that were either forgotten or were difficult to recollect and he agreed to participate in this treatment, however because of stormy weather and scheduling time around his job, four appointments have been cancelled. I would like to complete my evaluation if it would please the court, for this examining period to be extended another two or three weeks so that I may explore the hypnotherapy the amnestic periods that Russell exhibits concerning the events at issue.

2. *Russell Bryant is aware of the nature of the charges against him, his part in the proceedings in the court and he is able to cooperate with his counsel in his own defense, therefore in my opinion, he is competent to stand trial.*

3. Hysterical personality and hysterical neurosis—dissociative type are considered a mental disease or illness in the Diagnostic and Statistical Manual of Mental Disorders of The American Psychiatric Association and fulfill the definition of 552.010 RSMo. He had manifestations of this illness during hospitalization in March 1973 in Anchorage, Alaska.

4. It is extremely difficult to give an opinion as to whether at the time of the alleged criminal conduct the accused, Russell Bryant, did not know or appreciate the nature, quality or wrongfulness of his conduct or as a result of mental disease was incapable of conforming his conduct to the requirements of law. *I can state that to the best of my knowledge Bryant does not exhibit any impairment of his cognitive faculties except that at times he exhibits poor judgement but*

*there is no apparent impairment of perception, there is a question concerning his memory functioning.* It can be posited that under severe emotional stress Russell may have difficulty in immediate recall and have amnestic states as a result of his dissociative reaction.

5. It is recommended that since Bryant does not pose a dangerous threat to the community that he be allowed to enroll in high school and graduate and maintain his job and that he be placed under probationary supervision. Individual or group psychotherapy, especially including his wife, would be very helpful to help him develop insight for a better self image of himself and a better masculine identification." (Emphasis supplied.)

The February 21, 1974, supplementary report of Dr. Marco stated movant had been seen again on January 24, 28, February 8 and 11, 1974, and further stated:

"As to the issue of criminal responsibility, I refer to the report of January 10, 1974, paragraphs 3 and 4 in The *Discussion.* Again it is difficult to be firm that at the time of the alleged act, the accused, Russell Bryant, did not know or appreciate the nature, quality or wrongfulness of his conduct nor can I recommend that as a result of mental disease he was incapable of conforming his conduct to the requirements of the law. *To the best of my knowledge Bryant does not exhibit impairment of his cognitive faculties, except that at times he exhibits poor judgement and poor memory.* Under severe emotional stress, he may have difficulty in immediate recall and have amnestic states as a result of his dissociative reaction.

Further, in spite of history of 'passing out' on several occasions and the suggestion of 'post ictal' state, no organic evidence was found to substantiate impairment of cognitive faculties at the time of arrest and the subsequent voluntary act of giving up his rights. Although it appears that Mr. Bryant voluntarily confessed, I am struck by the enormity of his response to fear and the subsequent diffi-

culty he has in talking to me about the events and the mental mechanisms of denial and suppression that are presently operating." (Emphasis supplied.)

On February 25, 1974,[2] movant and his attorney appeared in court. Movant withdrew his previous plea of not guilty and entered a plea of guilty to count two, rape. Count one, kidnapping, was subsequently dismissed. In connection with the guilty plea, the circuit court interrogated movant at length. Most of the dialogue between the court and movant consisted of the court informing movant of his various rights and asking him if he understands what he has been told or if the court's statement as to a matter is correct, to which the movant's replies usually consisted of "Yes, your Honor." When asked to recite the events of August 30, movant replied that he did not remember. He said the last thing he recalled that day was leaving home about 8 p. m. in his car with Ernie Baker and John Gallup and going to a street dance in Columbia and drinking, presumably intoxicants. He next recollected being at home about 1:30 or 2 a. m. the next day and going to work. He could not recall giving a statement to the Columbia police. The court discussed his amnesia with him and movant acknowledged that he understood that if he desired to raise mental disease or defect as a defense he would have to plead it and he declined to do so. The court asked him to state why he should enter a plea of guilty to the charge of rape since he had no recollection of the matter, and the movant stated: "Well, Your Honor, for one thing, it was my car, I did leave the house with the two guys and I don't know where I was, don't remember, it's her word against mine so in her case her is stronger than mine."

The court requested the prosecutor to state the facts and told movant to pay attention. The prosecutor then read a statement taken from movant. It included date and place of birth, home address, marital status, and that he had a seven-month-old son; type, color and year of the car he owned; that he left in the car with the two people named supra, and that they were going rabbit hunting. The court then asked movant about these matters and he acknowledged that each item was correct. The details of the rape were read from the statement and additional testimony was outlined by the prosecutor. Movant acknowledged he understood the state would prove the stated facts. His appointed counsel was also questioned. The prosecutor recommended a sentence of twenty-five years and the defense attorney requested a presentence investigation. The judge again asked movant if he still desired to plead guilty and movant said yes. Presentence investigation was ordered and the cause laid over.

On June 3, 1974, the parties and attorneys again appeared in court for the purpose of finally disposing of the case. Defense counsel reviewed movant's life and the crime in detail pointing out certain mitigating factors and asked the court to consider movant for a probation hearing. The court then imposed a sentence of twenty-five years and set a probation evidentiary hearing for June 6, 1974.

On June 6, 1974, the parties and attorneys again appeared in court. Dr. Philip Marco, the psychiatrist who previously examined movant, appeared and testified. He first saw movant in November 1973 for the purpose of examining him for competency to stand trial and for criminal responsibility. Movant was an in-patient at Missouri University Service Psychiatric Division from about November 17 to about December 19, 1973. The doctor examined him for about seven hours initially and then again for about another five hours. The doctor's testimony conformed to his earlier reports. He testified that his diagnosis as to defendant's psychological characteristics had been hysterical personality and hysterical neurosis. He was asked about these diagnoses and testified as follows:

2. The transcript of the court proceedings of February 25, June 3 and 6, 1974, are in evidence in this proceeding.

"A. That was hysterical personality and hysterical neurosis.

Q. What is hysterical personality?

A. That's attendant on a deeply ingrained pattern disturbance in which an individual shows emotional liability, that is difficult in maintaining emotional stability, with attendant self-serving mechanisms and showing defense mechanisms that were inefficient in his endeavor or attempts to handle anxiety. We feel it's a rather inefficient, a rather unsophisticated method of handling ordinary stresses that people meet in the course of a day. This in brief is the sum of what a hysterical personality is.

Q. The other?

A. Hysterical neurosis in which certain symptoms of disorganizing to the personality such as amnesias, amnestic states can occur, and we had examined Russell for how serious amnestic states were in him. He did show us some difficulty in recalling important events and this was one of the reasons why we asked for an extension of his examination.

Q. Now, as a result of your examination did you reach a diagnosis as to his social characteristics?

A. Yes, we did, sir.

Q. What was that?

A. We found Russell to be rather immature, withdrawn, had difficulty with some authority figures, although he was rather passive and went along with forceful suggestion. He had some difficulty making appropriate interpersonal relationships with women, and we were of the impression that he was a rather easily led and a rather passive dependent person when he related to other individuals in his immediate environment. He was a likeable young man in the ward; he [has] made fairly good friends, although they weren't close friends.

There was some distance between, and a rather immature approach to some of these friends, but they did appoint him to be president of the patient government during his stay at the Medical Center In-Patient Service."

Additionally, a twenty-one-year-old girl, and the husband and wife who owned the restaurant where movant had been employed testified on movant's behalf. The girl testified that she had known movant since March 8, 1974. Both worked at the restaurant and were good friends. The tenor of her testimony was that he conducted himself normally during the time she knew him. The husband and wife testified that movant came to work for them as a dishwasher in December 1973 or early 1974 and shortly thereafter he became a cook. The tenor of their testimony was that movant was a very good employee, helped out anywhere he was needed, and did so on his own initiative. He was trusted with money; and if movant were available to continue working they would promote him to supervisor in the kitchen. Movant mixed well with customers and other employees and everybody liked him.

■ Movant contends his evidence on this 27.26 motion showed that the guilty plea was received at a time when a bona fide doubt existed as to his mental competency to proceed and, therefore, the court erred in not, sua sponte, holding a hearing before proceeding to take the plea of guilty. The legal authority movant principally relies upon is *Pate v. Robinson, supra.* There the court held that when the circumstances create a bona fide doubt as to whether the accused is mentally competent to stand trial the court must hold a hearing and decide that question. Under Missouri statutory law, a person is not competent to proceed if he, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense. Sec. 552.020, RSMo Supp.1975.

The factual basis for movant's claim that a bona fide doubt as to competency to proceed existed is primarily that part of the

psychiatric examination reports of Dr. Marco which diagnosed movant's condition, inter alia, as (1) hysterical personality—moderately severe and (2) hysterical neurosis—dissociative type severe. What this particular diagnosis may mean would, perhaps, be left in doubt except for the fact that the report itself belies any inference that the movant, at the time of the examination, was suffering under any mental disability affecting his appreciation of the charges against him. The report stated, "I can state that to the best of my knowledge Bryant does not exhibit any impairment of his cognitive faculties except that at times he exhibits poor judgement but there is no apparent impairment of perception, there is a question concerning his memory functioning. . . ." Other quotations from the reports of Dr. Marco appearing supra further support the conclusion that there was no reason to believe movant was not mentally competent to proceed.

Sec. 552.020, subsec. 3(3), RSMo Supp. 1975, requires that the report of the psychiatric examination contain an opinion as to whether the defendant is competent to proceed. The report of Dr. Marco in the instant case contained such an opinion as follows: "2. Russell Bryant is aware of the nature of the charges against him, his part in the proceedings in the court and he is able to cooperate with his counsel in his own defense, therefore in my opinion, he is competent to stand trial."

Sec. 552.020, subsec. 6, provides that if neither the state, the accused, nor the accused's counsel contest the opinion referred to above, the court may make a determination and finding of record on the basis of the report filed or may hold a hearing on its own motion. It further provides that if any such opinion is contested the court shall hold a hearing on the issue. In the instant case, the opinion was not contested and, therefore, a hearing was not mandated by this statute. The circuit court in its findings of fact and conclusions of law in the instant 27.26 proceeding stated that it had previously found that movant was, in fact, competent to proceed on the basis of the uncontroverted opinion of Dr. Marco. The

court further found that there was no independent bona fide doubt as to movant's competence to proceed.

Throughout these three court appearances, there is no suggestion by anyone that Bryant did not understand the proceedings nor is there any testimony, statement, or conduct on movant's part that would tend to indicate that such was the case. At the June 6, 1974, hearing, Dr. Marco testified at length concerning the movant, the purpose of which was to persuade the court to place movant on probation. The doctor's testimony in no way indicates any incapacity of the movant to understand the proceedings and to cooperate with counsel. To the contrary, the testimony shows the opposite as does the movant's responses to the court's inquiries as shown in the record. Although this testimony came after the plea of guilty was accepted and punishment assessed, it was still during the time the trial court had control of the case. Even though the June 6 evidentiary hearing was not for the specific purpose of determining competency, it afforded the movant a full and complete opportunity to bring forth any evidence and make any contention that he was unable to understand the proceedings or cooperate in his own defense.

Movant testified at the 27.26 evidentiary hearing. The motion alleged, inter alia, that he was not competent at the time he pled guilty and that he was then under the influence of certain drugs. He testified he had taken about fifteen Dilantins the morning of the guilty plea proceedings; that they made him dizzy; the proceedings did not matter to him as he just wanted to get them over with; he was kind of floating and his mind was just blank. He testified he did not recall being asked some of the questions during the plea proceedings and did recall others. One of his allegations was that he has been denied effective assistance of counsel. In connection with this allegation he testified that prior to his guilty plea he visited his court-appointed attorney quite a few times. His attorney "said there was nothing he could do, he said that he had seen what the Baker boy got

and Gallup boy, and he said there's no way he can beat the case, that the only thing left to do is try for probation or a lesser sentence." [3] Movant stated he requested his lawyer to file a mental defense, that he was incompetent to stand trial but that the lawyer said, "He didn't say anything at all, he said was—there was no use, he couldn't beat the case. He said—and as far as my mental problem, he said they would probably dismiss it any way. Q. [by public defender] Did he [court-appointed attorney at guilty plea proceedings] or did he not show you a report that Dr. Marco had filed with the Court?" Movant testified he had requested his lawyer to obtain records of his hospitalization in Anchorage, Alaska, and the lawyer said he obtained them but movant didn't see the records. Movant recalled specifically asking the lawyer to investigate the background of the complaining female witness but the attorney again told him it would be a waste of time. Movant stated he told his attorney he wanted a trial on the rape charge to which his attorney replied that from what he had seen of the case there was no way he could go to a courtroom and try to beat the case, again referring to the results of the Baker and Gallup trials. The attorney said a plea of guilty was the "only way"; that movant would probably get probation or maybe two years or, if not, he "might get as much as Bill and them, or life."

Movant said he had a conversation with his attorney on the day he pled guilty prior to going to court. His attorney told him the decision reference pleading guilty was movant's decision. Movant was asked what his attorney said to him at that time about his case and the record shows the following:

"A  He said that maybe the Judge would give me probation, or a less sentence than the Baker boys had got.

Q  Did you understand what he meant by that?

A  No, sir.

Q  Did you ask him the question?

A  Yes, sir, I asked him, in other words you mean I'm going to into the courtroom and enter a plea of guilty to something I don't even know whether I did and I'm taking a chance of getting probation or life in prison, he said I'm sure you won't get life, but you won't get as much as the Baker boys got.

Q  What did you say to that?

A  I didn't know what to say.

Q  You understand what he was telling you as far as what the situation was?

A  Yes, sir."

Movant's attorney also testified. Without setting forth all of his testimony, suffice it to say that the attorney testified movant gave no indication that he did not understand the proceedings nor any indication he could not cooperate in his own defense.

Aside from movant's testimony as to taking Dilantin on the day of the guilty plea, there was no evidence whatever that appellant was not competent to proceed or that he didn't understand what was going on. The testimony given by movant in support of his allegation of inadequate counsel in which he was critical of specific actions or no action by his attorney prior to the guilty plea clearly demonstrates movant knew precisely what was happening and, by his alleged requests and inquiries, knew exactly what was going on and was assisting in his own defense and interests.

The trial court found that movant was not under the influence of drugs when he pled guilty; that his appointed counsel was willing to try the case; that movant was not denied effective assistance of counsel; that there was nothing to indicate a hearing was needed as to his competency to proceed; nor was there any bona fide doubt raised with respect to that matter; and that movant was competent to proceed.

The trial court's findings, conclusions, and order denying relief on the 27.26 motion are all supported by the evidentiary record of the three appearances in court in February and June of 1974 in connection

---

3. See *State v. Gallup and Baker*, 520 S.W.2d 619 (Mo.App.1975).

with the guilty plea proceedings and the evidentiary hearing on the 27.26 motion and are not "clearly erroneous" unless that result obtains simply because the psychiatric report showed a diagnosis of hysterical personality—moderately severe and hysterical neurosis—dissociative type—severe.

Movant argues that because these mental diseases or defects are within the definition of mental disease or defect found in sec. 552.010, *supra*, that a bona fide doubt as to competency to proceed come into being. This definition, in effect, includes all mental conditions except those specifically excluded, but there is no official listing of the various types of defects, conditions, or diseases that are included. The "bona fide" doubt spoken of in *Pate v. Robinson, supra*, does not relate to a question as to the mere existence of some mental disease or defect, but assuming the existence of a mental abnormality, it relates to whether there is a *bona fide doubt as to the defendant's competence to proceed.*

*Briggs v. State*, 509 S.W.2d 154 (Mo.App. 1974), cited by movant, was a habeas corpus seeking the release of Briggs from incarceration in the Fulton state hospital which resulted from the acceptance of a plea of not guilty by reason of mental defect or disease to a charge of burglary and stealing. Briggs had undergone a mental examination at the request of his appointed counsel to determine (1) " 'if he was competent to stand trial' " and (2) " 'if he had been suffering from a mental disease or defect at the time the offense occurred.' " 509 S.W.2d at 155.

In *Briggs,* the findings of the psychiatric examination prepared pursuant to sec. 552.-020 were as follows (509 S.W.2d at 155):

"1] That the accused has a mental disease or defect within the meaning of Section 552.010, which existed at the time of the alleged offense.

2] That the accused has the capacity to understand the proceedings against him and can assist in his own defense.

3] That the accused, as a result of mental disease or defect, did not know or appreciate the nature, quality or wrongfulness of his alleged conduct and was incapable of conforming his conduct to the requirements of the law.

4] That the accused requires psychiatric hospitalization pending further proceedings."

Following the filing of the results of the psychiatric examination, the cause was set for trial. However, prior to the trial date, petitioner's counsel filed a "Notice of Intention to Plead Not Guilty By Reason of Insanity." Shortly thereafter the prosecutor "accepted" this notice without the written notice that Briggs had no other defenses to the charged offenses as required by sec. 552.030, subsec. 2. The circuit court then accepted a plea of not guilty by reason of mental disease or defect and ordered petitioner committed to the custody of the director of the division of mental diseases. All of this occurred without a hearing, absent the petitioner's presence, knowledge or consent, and without the court ever having made a determination and finding of record that petitioner was mentally fit to proceed.

In *Briggs,* the court of appeals found at 509 S.W.2d 157:

"The following expressed findings set forth in the certified report of the psychiatric examination of petitioner, that he '*has* a mental disease and defect within the meaning of Section 552.010, which existed at the time of the alleged offense', that he '*requires psychiatric hospitalization pending further proceedings*', and that 'he has the capacity to understand the proceedings against him and assist in his own defense', are irreconcilable and at war with each other and, standing alone, raised a 'bona fide doubt' and cast substantial suspicion upon petitioner's mental fitness to proceed. The trial court's failure to conduct a hearing and determine petitioner's mental fitness to proceed constituted an abuse of the discretion invested by subsection 6 of Section 552.020, supra, thereby so tainting all subsequent proceedings that the Order of Commitment issued out of the Circuit

Court of Clay County, Missouri, under date of April 14, 1971, must be declared invalid."

*Briggs* correctly applies the standards imposed by *Pate v. Robinson, supra,* to the facts of that case. The factual makeup of the present case distinguishes it from *Briggs.* One distinguishing factor is the movant's presence before the court on three different occasions. The judge had an opportunity to observe the movant and analyze the responses to his questions. Second, the court had the opportunity to hear the testimony of Dr. Marco and several persons who worked with movant. The object of this testimony was to prove that movant was not a dangerous person and that he would be able to function as a law-abiding citizen if placed on probation. The testimony of those who worked with movant, noted supra, portrayed movant as a hard worker, capable of accepting responsibility, who worked well with others, and was generally liked by the customers at the restaurant. Finally, unlike the petitioner in *Briggs,* the psychiatric report did not recommend that movant be hospitalized for his condition, nor did it unequivocally state that movant did not know the nature, quality or wrongfulness of his conduct or was unable to conform his conduct to the requirements of the law at the time of the alleged crime. Note that in *Briggs* the recommendation that the petitioner be hospitalized was given emphasis by the court. In the present case Dr. Marco had merely recommended "individual or group psychotherapy", indicating a much less severe case of mental disease or defect.

In light of these differences, the findings set forth in the reports of the psychiatric examinations were not "irreconcilable". The finding that the movant had the capacity to assist in his defense and the conclusion that he was competent to stand trial were supported by the evidence adduced at the hearings from movant and others and from the findings and conclusions of Dr. Marco set out supra. The evidence clearly established that movant fully comprehended that which had been occurring in his daily life, social life, and in court. All of this confirmed the prior determination made by the trial judge on the basis of the psychiatrist's report that movant understood the proceedings and was capable of cooperating in his own defense, despite his mental disease or defect. The facts presented here were insufficient to raise a bona fide doubt regarding the mental fitness of movant.

On the periphery of this case, there seems to be the question as to whether or not defense trial counsel failed to adequately represent the movant by reason of his failure to request an evidentiary hearing with respect to movant's competency to proceed. It is quite clear that under sec. 552.020, subsec. 6, a defendant (defense counsel) and the state both have the absolute right to contest a psychiatrist's opinion with reference to fitness to proceed and in that way require an evidentiary hearing be held. There certainly is no question but what the responsibility for representing a defendant, including the making of numerous decisions throughout the proceedings, is lodged with defense counsel. Courts ought not interfere with defense counsel's responsibility in this regard unless the facts of the situation clearly demonstrate that justice requires the interference. It simply cannot be said that a defendant's overall interest will *always* be served by holding an evidentiary hearing each and every time a medical report states that he is suffering from some kind of mental disease or defect. At such a hearing it can be anticipated that the state, in order to show a defendant is competent to proceed, may well introduce substantial testimony with reference to his daily life and conduct. The total effect of such a hearing may well be to impede and perhaps forestall arrangements with respect to a plea of guilty which could be in the interest of the defendant. The choice as to whether or not to have such an evidentiary hearing should be left where the statute places it, to wit, on demand of the defendant, the state, or the court. With respect to this particular case, it is apparent that the movant hoped for and earnestly sought probation and, to that end, introduced substantial tes-

timony that he was reasonably able to handle his own affairs and that he knew what was going on. No where does it appear that movant desired the consequences of being found mentally unfit to proceed, as set forth in sec. 552.020, subsec. 7.

The court has no desire to minimize the import of *Pate v. Robinson, supra,* nor any of the other cases which have addressed themselves to the mental competency of a defendant to proceed in a criminal case; however, the requirement that a court must act *sua sponte* to hold a hearing ought to remain the exception rather than the rule. In this way a defendant has the benefit of the considered opinion of his attorney and is left with a choice. To require an evidentiary hearing in every case where there is any finding of mental illness removes the benefit of choice from the defendant.

From the foregoing, this court concludes that the trial court need not, sua sponte, hold a hearing just because a psychiatric report indicates a defendant is suffering from a mental disease or defect under sec. 552.010, even though the report also states a defendant is competent to stand trial. Sec. 552.010 does not identify specifically the diseases or defects covered by that section and there is no official listing which a trial court might turn in order to know that a diagnostic term used by a doctor falls within the scope of sec. 552.010. When a psychiatrist's report shows a diagnosis of some mental defect, it would certainly be prudent for the trial court to set an evidentiary hearing at which the report and any other evidence pertinent to the issue could be placed in evidence and the court would then make its findings as to competency to proceed, but this is not mandatory unless the findings in the report are contested or other facts raise a bona fide doubt as to competency to proceed. On the facts of this case, neither *Pate v. Robinson, supra,* nor *Briggs v. State, supra,* compel a reversal of the judgment.

The judgment of the circuit court is affirmed.

MORGAN, C. J., and HENLEY, FINCH, and RENDLEN, JJ., concur.

DONNELLY, J., dissents in separate dissenting opinion filed.

SEILER, J., dissents and concurs in separate dissenting opinion of DONNELLY, J.

DONNELLY, Judge, dissenting.

In *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), the United States Supreme Court held that when circumstances create a "bona fide" doubt as to an accused's competency to proceed with trial, due process of law requires the trial court to conduct a hearing on the question, whether requested or not.

Judge Turnage, in his opinion in the Court of Appeals, said:

"Much more closely akin to the factual situation in this case is *Briggs v. State,* 509 S.W.2d 154 (Mo.App.1974) in which this court considered a psychiatric report which stated petitioner had a mental disease and defect within the meaning of § 552.010, RSMo 1969, and at the same time found he had the capacity to understand the proceedings against him and to assist in his own defense. This court held the report to be so irreconcilable that standing alone such report raised a bona fide doubt and cast a substantial suspicion upon petitioner's mental fitness to proceed. This court further held the failure of the trial court to conduct a hearing to determine petitioner's mental fitness to proceed constituted an abuse of discretion under Sub-Section 6 of § 552.020, RSMo 1969.

"The question in this case is whether or not the two reports of Dr. Marco were sufficient to raise a bona fide doubt as to Bryant's competency and mental capacity to proceed on the charges pending against him and to intelligently assist his counsel. This court has concluded, as it did in *Briggs,* that the inconsistent and irreconcilable nature of the report required the court to sua sponte hold a hearing as provided in Sub-Section 6 of § 552.020 to determine the mental fitness of Bryant to proceed. This is based upon

the finding of Dr. Marco on the one hand that Bryant was suffering from hysterical personality and hysterical neurosis dissociative type at the time of the report on January 10, 1974. There is nothing in the report of February 21, 1974, to indicate such diagnosis had been changed. Dr. Marco was careful to point out that hysterical personality and hysterical neurosis are both considered to be a mental disease or illness as defined in § 552.010.

"At the same time Dr. Marco stated Bryant was aware of the nature of the charges and was able to cooperate with his counsel and was, therefore, competent to stand trial. There is no explanation in either report to show how Bryant could be suffering from these mental diseases and defects and at the same time be competent to stand trial. In fact, other portions of the reports would seem to negative the conclusions as to Bryant's competency, at least absent some explanation on the part of the psychiatrist. These include the finding that Bryant had a problem concerning his memory functioning and that under severe emotional stress he had difficulty in immediate recall and had amnestic states. A further observation in the report of February 21 adds to the doubt of Bryant's capacity to proceed. Dr. Marco stated 'although it appears that Mr. Bryant voluntarily confessed, I am struck by the enormity of his response to fear and the subsequent difficulty he has in talking to me about the events and the mental mechanisms of denial and suppression that are presently operating.' In view of all of the opinions and observations stated by Dr. Marco in his two reports, this court is forced to conclude that such reports were so irreconcilable that they raised a bona fide doubt as to Bryant's fitness to proceed.

"With the doubt thus raised, the court should have sua sponte held a hearing on Bryant's mental ability to understand the nature of the charges and his ability to cooperate with his counsel. This was required under *Pate* * * * and *Briggs*."

In my opinion, the *Briggs* holding is sound, it follows the letter and spirit of *Pate,* and I would adopt it as the position of this Court. A hearing on a defendant's competency to stand trial should be held sua sponte when a psychiatric report indicates that the defendant is competent to stand trial but also indicates he is suffering from a mental disease or defect under § 552.010, RSMo 1969. Further, I agree with the Court of Appeals that under the facts in this case, and the holding in *Briggs,* a bona fide doubt was raised as to appellant's competency to stand trial and a hearing should have been held by the trial court sua sponte on this issue.

The judgment of the trial court is clearly erroneous. It should be reversed and the cause remanded with directions to the trial court to vacate the original judgment and sentence. *Pate v. Robinson,* supra, 383 U.S. 375, 387, 86 S.Ct. 386, 15 L.Ed.2d 815. The State would then be free to proceed further against appellant, assuming, of course, that he is then competent. *Drope v. Missouri,* 420 U.S. 162, 183, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

I respectfully dissent.