**STATE of Missouri,
Plaintiff-Respondent,**

v.

**David L. MOON, Defendant-Appellant.**

**No. WD30989.**

Missouri Court of Appeals,
Western District.

July 8, 1980.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 4, 1980.

Application to Transfer Denied
Sept. 9, 1980.

Jon Krebbs, Asst. Public Defender, Seventh Judicial Circuit, Liberty, for defendant-appellant.

John Ashcroft, Atty. Gen., Jefferson City, Darrell Panethiere, Asst. Atty. Gen., Kansas City, for plaintiff-respondent.

Before Clark, P. J., and DIXON and SOMERVILLE, JJ.

DIXON, Judge.

This is an appeal from a judgment of the Circuit Court of Clay County. A jury found David L. Moon guilty of attempted robbery in the first degree and assessed punishment at five years imprisonment.

The occurrence giving rise to the charge took place in a savings and loan association. Diana Foland and Sara Gregory, tellers at the bank, and a bank supervisor, Max Blevin, were witnesses to the events.

Miss Foland approached the defendant when he called her over to the window where he was standing. His hand was in the pocket of his jacket, and he caused Miss Foland to believe he carried a gun after he "pointed it up" and "moved it around" at her. He then asked Miss Foland for money and stated several times he was "not bullshitting" her. When Miss Foland started to open the money drawer, defendant told her he was "just kidding," and he didn't want her "to say anything to anybody." Defendant pulled his hand out of his pocket, thus revealing he was not armed; but until that time, she believed he was serious. Defendant then asked Miss Foland for street directions. Being quite upset, she had another teller help him and then went to the rest area.

Defendant took a seat at the front of the office. Having been informed that defendant had caused a disturbance, Blevin approached defendant and initiated a casual conversation. Blevin "turned his back," and defendant walked over to Miss Gregory's window and began talking with her. Blevin noticed that defendant's hand was in his coat pocket on the counter, but could not tell whether defendant was carrying a gun.

Miss Gregory was told by defendant that he had a gun in his pocket. She asked to see the gun, but he refused to show it "because then everybody else in the bank would see it." When Miss Gregory motioned to Blevin for help, defendant removed his hand from the pocket, and Miss Gregory noticed he was unarmed.

Upon being signaled by Miss Gregory, Blevin indicated to the head teller to sound the alarm. This was misinterpreted, and the teller took a photograph of defendant instead. Miss Gregory stated defendant became quite nervous after she called for Blevin.

Miss Gregory commented to Blevin, "Do you want to hear about the practical joke this fellow is trying to pull on us?" Blevin

said he thought the defendant indicated he "just wanted to see what the teller would do if he would cause some kind of excitement."

Blevin took defendant to the branch manager, and defendant was reprimanded for his actions. Defendant asked the men not to call the police because he was just having fun. When this conversation terminated, defendant was escorted out of the bank. He made his "escape" from the scene by walking to a bus stop and waiting for a bus to return to his home at the Helping Hand Institute.

Defendant was interviewed later that afternoon at police headquarters. In a statement, defendant acknowledged his part in the events which occurred earlier that day. Defendant again stated his actions were motivated by a curiosity to see what type response would be elicited.

Defendant elected to testify and corroborated the State's evidence. When asked by counsel if he had anything further to say, he stated that Satan had inspired him to commit this "very spontaneous, bizarre crime." He further testified that he had been arrested before, once for indecent exposure, and once for molesting a minor; but he had never been convicted. These arrests resulted in mental examinations, but he was always, according to his testimony, given "a clean bill of health."

At the close of the State's evidence, defendant moved for a directed verdict of acquittal, raising the issue of the sufficiency of the evidence to show an intent to commit the crime. A claim of error in the refusal of this motion is the only point raised in the defendant's brief on appeal.

In testing the sufficiency of the evidence by motion for judgment of acquittal, facts and favorable inferences reasonably drawn therefrom must be considered in the light most favorable to the State, and all inferences and evidence contrary must be disregarded. *State v. Crews*, 585 S.W.2d 131 (Mo.App.1979); *State v. Longmeyer*, 566 S.W.2d 496 (Mo.App.1978); *State v. Strong*, 484 S.W.2d 657 (Mo.1972). Review is limited to whether the evidence is sufficient to make a submissible case, *State v. Longmeyer, supra; State v. Gamache*, 519 S.W.2d 34 (Mo.App.1975); *State v. Strong, supra*, and whether there is sufficient evidence from which reasonable persons could have found defendant guilty. *State v. Longmeyer, supra; State v. Johnson*, 510 S.W.2d 485 (Mo.App.1974). Substantial evidence means evidence from which the trier of facts reasonably could find the issue in harmony therewith. *Kansas City v. Oxley*, 579 S.W.2d 113 (Mo. banc 1979); *State v. Taylor*, 445 S.W.2d 282 (Mo.1969); *State v. Chastain*, 585 S.W.2d 562 (Mo.App.1979).

The gist of defendant's complaint is that there is no substantial evidence proving defendant's culpable state of mind. Intent, as an element of an offense, is generally not susceptible of direct proof and may be established by circumstantial evidence or inferred from surrounding facts. *State v. Gannaway*, 313 S.W.2d 653 (Mo.1958); *Kansas City v. Reeves*, 553 S.W.2d 548 (Mo.App. 1977); *State v. Holliday*, 546 S.W.2d 38 (Mo.App.1976). An inference as to defendant's culpable state of mind is strongly supported by the following:

1. Defendant's giving the appearance of being armed;
2. His statements that he wanted money and that he wasn't "bullshitting."

The jury could reasonably conclude, based on these facts, that defendant did intend to rob the bank. A jury is permitted to draw from the evidence such reasonable inferences as the evidence will support. *State v. Simone*, 416 S.W.2d 96 (Mo.1967); *State v. Ciarelli*, 366 S.W.2d 63 (Mo.App.1963). The jury was to decide whether defendant was playing a practical joke or whether he actually intended to rob the bank and whether, for some reason, he decided against it at the last moment.

A jury may believe or disbelieve all, part, or none of the testimony of any witness, including the testimony of defendant. *State v. Easton*, 577 S.W.2d 953 (Mo.App. 1979); *State v. Pinkus*, 550 S.W.2d 829 (Mo. App.1977); *State v. Wynn*, 391 S.W.2d 245 (Mo.1965). Though defendant repeatedly

stated the incident was a "joke," and he had no intention of stealing the money, he also revealed information which could have affected his credibility as a witness. Defendant testified that he had been arrested at least three times, including arrests for indecent exposure and for molesting a minor. These arrests led to the mental examinations at the Fulton State and St. Joseph Mental Hospitals. · The State, in final argument and without objection by the defendant, used the defendant's admission of prior crimes and the subsequent mental examinations, not only for impeachment but to argue that defendant should be imprisoned, implying his propensity for sexual offenses might cause something "drastic" to happen. The trial court did not err in overruling defendant's motion for judgment of acquittal.

What has thus far been written would ordinarily dispose of the appeal. The record in this case, however, discloses two areas of constitutional error which lead to the inescapable conclusion that plain error has occurred and caused a manifest injustice. The first such error is a deprivation of due process under the Fifth and Fourteenth Amendments to the Constitution of the United States. The interlocking and mutual destructive error involves the denial of effective assistance of counsel in violation of the Sixth Amendment of the Constitution of the United States.

The Fifth Amendment error arises under the doctrine of *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). Before the trial of this case commenced, the trial judge inquired of counsel, out of the hearing of the jury, as follows:

"Gentlemen, the defendant in this case is David L. Moon. Mr. Moon has been before this Court previously on other charges, or, at least another charge. In connection with the other charge, if my memory is correct, he was committed to the Fulton State Hospital for mental evaluation, is that correct, Mr. ____?

MR. [Defense counsel]: Uh huh.

THE COURT: When that report came back I believe that they found that he was not suffering from mental disease or defect excluding responsibility.

MR. [Defense counsel]: That's correct.

THE COURT: And they found further that he was able to assist his counsel in defense of his case at that time.

MR. [Defense counsel]: That's correct.

THE COURT: *And I would ask at this time is there a plea—there's no plea in this case of not guilty by reason of mental disease or defect excluding responsibility?*

MR. [Defense counsel]: *No there isn't, there is not.*

THE COURT: All right, is there any reason, is there any information that you feel the Court should have in regard to Mr. Moon's mental condition at this time that might be important?

MR. [Defense counsel]: Well, Your Honor, I'd like the record to show that I have discussed this matter with Mr. Moon and asked if he would like to have another evaluation at the Fulton State Hospital and he has declined that right. He has always been responsive when I've talked to him and he's been able to explain what went on at the time of the incident. He knew that at the time that he was there that it was wrong, but he does not—I do not feel that he's suffering from any mental disease or defect at this time.

THE COURT: Do you feel that he's fully able to assist you, then, in the defense of this case?

MR. [Defense counsel]: I do, and he has been.

THE COURT: Very well, the Court will find him competent, then, to proceed at this time." (Emphasis added).

This colloquy demonstrates that both counsel for the defendant and the court were ignorant of the plea in the case. The record shows the following concerning the defendant's plea:

"Thereafter, and on January 24th, 1979, the following entry was made:

'Comes now state by *asst.* prosecuting attorney and defendant in person and by attorney, (public defender). Defendant

arraigned, and defendant enters pleas of not guilty. State *announces ready for trial and cause set for trial the 2nd day of April, 1979, at 9:00 a. m.*

*Public defender office appointed* to represent defendant. Defendant ordered to appear for docket call on Mar. 30, 1979 at 9:00 A.M.

Bond reduced to $5,000.00. *Defendant changes plea to plea of not guilty and not guilty by reason of mental disease or defect.'* " (Emphasis supplied).[1]

There is nothing in the record, aside from the recital of appearances, to show that defendant was present when his counsel misstated the nature of defendant's plea and purported waiver of the defendant's right to a determination of his mental condition, all of which occurred out of the hearing of the jury. If it had occurred in open court, with the jury present, the defendant would not have been privy to the remarks at the bench. If it occurred in chambers, the defendant was less likely to have had any chance to be aware of the proceedings.

The bizarre circumstances of the offense have been previously related, but the only to convey an accurate impression of the mental state exhibited by the defendant when he testified in the case is to recite verbatim portions of his testimony. Prior to the excerpted testimony, the defendant, in a faltering and wandering fashion, had related what had occurred to the time of the second teller incident. He then related the substance of the second incident as follows:

A. I came to her counter and I put my hand in my pocket again—and I put my hand in my pocket. I don't think I had it right up on the counter, probably at an angle. Anyway, I do remember saying, "If I tell you something, if I ask you a question do you promise not to tell anybody?" I think I asked her that twice. But I never did say that I was going to rob her.

Q. Did you tell her that you had a gun in your pocket?

A. No. I remember she—I'm glad you brought that to my attention it's bringing my memory back to me. She asked me, "Why don't you let me see your revolver?" She said, "revolver." I said, "No, I can't do that, it would look too conspicuous for everybody else." You know, all the other people in the bank.

Q. Did she give you any money?

A. No, she did not.

Q. What happened then?

A. Max came in on the scene. *Sara* said something to him, you know, like— well, you know what she said. I don't remember what it was. *Can you remember it for me* ?

Q. Do you mean the statement that she told Max about the practical joke?

A. Yes, yes.

Q. She said that?

A. Yes, uh huh.

After a further recital about the discussion with the male personnel at the scene, defendant's counsel inexplicably put the following question to the defendant which elicited the damaging testimony which follows:

Q. Now, is there anything else you'd like to tell this jury, anything that I haven't covered to this point?

A. Yes, I would.

Q. Okay.

A. But, I don't know if he'll allow it or not.

Q. Well, this is only in regard to your defense?

A. Exactly, that's how I feel.

Q. Okay, go ahead and tell the jury.

A. It has to do with the reason I done it. I mean, this is something I want to

---

1. It is not clear whether the plea of not guilty by *reason of mental disease or defect* was entered on January 24 or on March 30. It would be unusual for both pleas to have occurred at the same time, and it seems more likely that the second plea shown in the record was entered on March 30.

tell everybody in the court. It's a very spontaneous, bizarre crime. You have to concur with me on that, of course.

You know, for the last 3 years I haven't been in my church. I want everybody to bear with me and please believe what I've got to say. I'm sure there's some here who do, Christians anyway.

For the last 3 years I haven't been in my church. I attend Grace Baptist Church on Vivion Road. And the devil made me do that Satan, Lucifer.

Not content with that bizarre statement, defense counsel then proceeded as follows:

Q. Do you have anything else to say, David?

A. I'm not through yet.

Q. Okay, I'm sorry.

A. It's quite alright.

But, you know, church life is wonderful and I was a fool not going back to church. In 1975 when I was arrested, I wasn't convicted, that was the first crime I ever committed. And I got out of jail on the 10th of May, '76, and went to Fulton State Mental Hospital, clean bill of health.

Then I was arrested for indecent exposure and that was a period of 3 months. They had me go to St. Joseph Mental Hospital. I was there 4 and a half months, clean bill of health.

Then I stayed in St. Joseph awhile then I came back to Kansas City, but I stayed in North Kansas City. I was renting a room in a basement.

And then I got arrested again and that was molesting of a minor. And it was—that was dismissed along with indecent exposure as you recall. And molesting a minor was a very mild, I mean, it wasn't like rape or nothing of that nature. I touched a 16 year old right here on her leg (indicates) and I said, "Take care and keep the lawyers happy," because she

told me, with her three other sisters that were with her there at the table, that they were helping some lawyers do some filing. And that was on a Saturday.

Q. David, I'm going to advise you at this time, you may be confusing the jury telling about some other charge.

A. Yes, I'm sorry. This is kinda getting away—.

Q. Do you have anything to tell the jury in regard to this particular case or anything else that you think that the jury should know before they determine the issues in this case?

A. No, I think I'll stop. I have nothing else to say.

Q. Don't let me stop you. If you have something you think that the jury should know I think you should go ahead and tell them. Let me ask you a question. Have you ever been convicted of any crime at all at this point.

A. I have not.

Q. Okay, do you have anything else that you want to tell the jury and this Court?

A. I just hope I'm not convicted of this one and go to prison. Prison is a terrible place to go. I am a soft hearted man. I've never been in a fight in my whole life and I want to go back to my church. I've got a lot of friends there and I know they have been praying for me on this crime here I committed.

I want to go back and get closer to God and Christ. I have redicated [sic] my life to God and I feel happy about that.

I have much self esteem, motivation, determination. I want my family to be proud of me again. I want to be proud of myself, respect, everything.

■ The conviction of an accused while legally incompetent is a denial of his due process right to a fair trial. *King v. State*, 581 S.W.2d 842 (Mo.App.1979); *Pate*

*v. Robinson, supra.* A person is not competent to proceed if, as a result of mental disease or defect, he lacks capacity to understand the proceedings against him or to assist in his own defense. Section 552.-020(1) RSMo 1978; *Bryant v. State,* 563 S.W.2d 37 (Mo. banc 1978). If a judge at any stage of the proceedings has reasonable cause to believe that a defendant has a mental defect or disease excluding fitness to proceed, it is incumbent upon the court to order a psychiatric examination and, if necessary thereafter, to hold a hearing to determine the issue. Section 552.020(2) RSMo 1978; *State v. Mayfield,* 562 S.W.2d 404 (Mo.App.1978); *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

The facts in the case at bar parallel, to some extent, those of *Drope* where the U.S. Supreme Court found a due process violation by the trial court's failure to permit a psychiatric examination of the defendant despite the indicia suggesting his incompetency. If the trial court in *Drope* had accorded proper weight to the information concerning the allegations prior to trial as to incompetency, the testimony at trial regarding the defendant's history of bizarre behavior and, finally, his suicide attempt, a sufficient doubt as to the defendant's competency to stand trial would have resulted. This doubt required further inquiry by the trial court as to the defendant's ability to proceed in order to prevent a due process violation. Likewise, in the instant case, the trial court should have been alerted to a possible lack of competency to stand trial in light of all the facts.

When considered as a whole, the following imply possible mental incompetency:

(1) prior commitments to mental institutions for evaluations;

(2) inappropriate behavior and responses on the witness stand;

(3) the bizarre circumstances of the criminal activity in the instant case;

(4) the nature of the prior offenses causing the earlier examinations.

Further concern that defendant suffered a denial of his due process right to a fair trial develops by the manner in which the first suggestions of possible incompetency were handled. At the arraignment, a plea of not guilty by reason of mental disease or defect was entered. Immediately before trial, in response to a question by the court, counsel denied that this plea was entered. This occurred despite the fact the plea was entered, at most, two months before trial. Defendant was never questioned by the court, although the court interrogated counsel concerning defendant's ability to stand trial. The court also knew that defendant had appeared before the judge on other charges and had been committed to a mental hospital for an evaluation. The trial judge then purported to recollect the result of that report which, so far as the record shows, was not before him. If the recollection of court and counsel as to the report was no better than of the plea, the court's statement is not entitled to much weight. Defense counsel asserted the defendant had declined to have another evaluation, had always been responsive with him, and, in his opinion, was not currently suffering from a mental disease or defect. The entire colloquy, including the misleading statements about the plea, does not cover a full page in the transcript. That record would make a close case on a matter of preserved error with respect to competency to proceed.

▆ In the present case, the trial court's continuing opportunity "to observe him (the defendant) in the context of the trial and to gauge from his demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him" should have alerted the court to the possible incapacity of the defendant. *Drope v. Missouri, supra,* 420 U.S. at 181. This is particularly true where the context of the trial develops a bizarre set of facts with regard to the instant offense.

▆ The court is not required to *sua sponte* conduct a competency hearing in the absence of circumstances which render suspect the psychiatric opinion which certified the accused fit to proceed. *Witt v. State,* 582 S.W.2d 325 (Mo.App.1979); *Miller v.*

*State*, 498 S.W.2d 79 (Mo.App.1973). However, the recollection of the report relied upon by the trial court was of a report which had been obtained for an *earlier* proceeding against defendant. Even if the suspicion or presence of some degree of mental illness or need for psychiatric treatment is not tantamount to an inability to stand trial, defendant's absurd behavior on the witness stand should have undermined the indicia of competency apparently relied on by the trial court, *i. e.,* the recollection of the old report and counsel's observations. A bona fide doubt may arise subsequent to a "clean" mental health report, but only under certain circumstances, one of which may be the court's observation of the defendant's erratic behavior .at subsequent proceedings. *Newbold v. State,* 492 S.W.2d 809 (Mo.1973), citing *Pouncey v. United States,* 349 F.2d 699 (D.C.Cir.1965). In post trial proceedings, the trial court in the instant case indicated such a doubt:

"where there is some appearance, at any rate, that this defendant may have been somewhat unstable and acting in a somewhat irrational manner."

This case may be classified as one of the exceptions referred to in the observation that "the requirement that a court must act *sua sponte* to hold a hearing ought to remain the exception rather than the rule." *Bryant v. State, supra* at 46. Factually, it is distinguishable from the majority of cases in Missouri dealing with disputes as to an accused's mental competency. Though the court concluded defendant was competent, this decision was based on a very dubious factual background. See *Witt v. State, supra; State v. Vansandts,* 540

S.W.2d 192 (Mo.App.1976); *Cole v. State,* 553 S.W.2d 877 (Mo.App.1977). Defendant's conduct at trial should have put the court on notice that a genuine question existed as to his ability to stand trial. *Sears v. State,* 536 S.W.2d 923 (Mo.App. 1976). Unlike *State v. Brizendine,* 433 S.W.2d 321 (Mo. banc 1968), there was evidence more akin to that in *Pate v. Robinson, supra,* to raise a question as to competency.

■ *Pate v. Robinson, supra,* requires that a competency hearing be conducted when a "bona fide doubt" as to the accused's mental ability is raised. Missouri requires an investigation of the accused's mental status when the court has "reasonable cause to believe" incompetency exists. Section 552.020(2) RSMo 1978. The evidence in the record sustains a reasonable belief that defendant lacked competence to stand trial, especially since no tangible proof exists to contradict this.[2]

■ But the question of the competence of the defendant does not stand alone on this record. The issue of the competence of trial counsel is also present and, if anything, reinforces the due process issue presented by the defendant's questionable mental capacity. While this court does not ordinarily review issues of competence of counsel on direct appeal, when the record is sufficient, it is appropriate to do so. *State v. Phillips,* 460 S.W.2d 567 (Mo.1970); *State v. Bosler,* 432 S.W.2d 237 (Mo.1968).

■ The present standard of review of competency of counsel is established in *Seales v. State,* 580 S.W.2d 733 (Mo. banc

2. Even if the trial court had *sua sponte* declared a mistrial upon its discovery that defendant may have been incompetent to stand trial and in order to provide for an examination, such a declaration would not have presented a double jeopardy question because it would have been made due to a manifest necessity. *State v. Irving,* 559 S.W.2d 301 (Mo.App.1977); *State v. Stevenson,* 589 S.W.2d 44 (Mo.App. 1979); *Gori v. United States,* 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961) [Where it appeared to the judge that the prosecutor's questions might lead to introduction of evidence of prior crimes, a reprosecution would not be

barred where a mistrial was declared without defendant's request.]; *Featherston v. Mitchell,* 418 F.2d 582 (5th Cir. 1970), *cert. den.* 397 U.S. 937, 90 S.Ct. 945, 25 L.Ed.2d 117 (1970) [Where testimony of defendant's physician raised serious doubt as to defendant's ability to assist in his own defense or understand the nature of the proceedings against him, there was no bar to a subsequent trial by declaration of mistrial to allow for psychiatric examination.]; and *Wilson v. State,* 348 N.E.2d 90, 92 (Ind.App. 1976) [Holding manifest necessity is established where it is determined during trial that the defendant is incompetent to stand trial.].

1979). The conduct of trial counsel is to be measured by comparison with reasonably proficient practitioners and, if not meeting that standard, is found deficient. There must be a further finding that the conduct complained of was prejudicial to the defendant.

■ Looking to this record, it is hardly arguable that defense counsel's conduct of this trial was deficient measured by that standard. Defense counsel was unaware of the plea entered by his own public defender's office of "not guilty by reason of insanity." This offense occurred January 12th, the insanity plea was entered a short time later, and the trial occurred April 2nd, so that there was no lapse of time or voluminous record to obscure the facts of the plea. The questions put to defendant by his own counsel, and set forth above, invited the rambling and self-destructive response made by the defendant. Confronted with a capable and aggressive prosecutor, it was sheer folly to permit the defendant an opportunity to tell the jury about his prior offenses and mental examinations. Mr. DeCuyper, in argument for the State, took repeated and maximum advantage of the admissions. It was argued that defendant had admitted other offenses for which he had never been punished; the defendant's characterization of the offense was ridiculed. The possible repetition of such offenses was mentioned. Reference was made to all the behavior of the defendant as follows:

"Now, I can walk the streets, and I hear it everyday from folks like all of us who live in this county, when is the law and the courts going to do something about all this criminal activity?"

and further:

"[I]f you want this type of an individual to walk our streets in this county, well, then you believe it was a practical joke. And if you don't want this kind of an individual *for whatever he's doing in the county*, not to walk it, then you find him guilty . . . ." (Emphasis added).

An argument of like tenor was made in final argument as follows:

"So, put it all together. He told you everytime he gets picked up he went somewhere for a mental examination but he got a clean bill of health every time. He told you that, not me. Put it all together and see what you got. There he is (indicates) right there. You want him out on the street then find it's a practical joke."

To all of this argument, not a single objection was interposed. Not only did Mr. DeCuyper hammer a nail in the defendant's coffin, he countersunk it.

Any reasonably capable practitioner would have checked the record for the plea entered. If for no other reason than to remove doubt, a motion for examination of the defendant should have been filed. Enough appears in the transcript that would indicate the defendant would, given an opportunity for a rambling and discursive answer, blurt out his past offenses. Since no convictions had been obtained on any of them, they would not have been before the jury for the State's use in a devastating argument but for the ill-advised question of "anything else you want to tell the jury." The prejudice inheres in what occurred and in the failure of counsel to determine the competency of the defendant in accordance with the statute.

■ The power to review *sua sponte* for plain error is rarely exercised—and properly so. *State v. Jackson*, 495 S.W.2d 80 (Mo.App.1973); *State v. Sockel*, 490 S.W.2d 336 (Mo.App.1973); Rule 30.20. It should be exercised in this case because both areas of error affect fundamental rights under our Federal Constitution, and it is clear that a manifest injustice has been done. If such review is not undertaken in a case like the present one, it never will be.

This case poses the same dilemma as that posed in *State v. Charles*, 572 S.W.2d 193, 199–200 (Mo.App.1978), and it must be resolved in a like manner by reversal. What Judge Somerville said in *Charles* as to the necessity for reversals to preserve the integrity of the judicial process cannot be improved upon and applies with equal force to this case.

838

The cause is reversed and remanded for further proceedings consistent with this opinion.

All concur.