STATE of Missouri, Respondent,

v.

Erman C. JAY, Appellant.

No. 14595.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 28, 1987.

Motion for Rehearing and
Transfer to Supreme Court Denied
Feb. 20, 1987.

Allen G. Rose, Springfield, for appellant.

William L. Webster, Atty. Gen., Elizabeth A. Levin, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Chief Judge.

A jury found Erman C. Jay ("defendant") guilty of selling methamphetamine and guilty of selling marihuana, § 195.020.-1, RSMo Cum.Supp.1984, assessing punishment at 25 years' imprisonment for each crime. The trial court imposed those sentences, ordering that they run concurrently. Defendant appeals, briefing four points. As the sufficiency of the evidence to support the verdicts is unquestioned, we synopsize only the evidence necessary to discuss the assignments of error.

Trooper Terry Gene Mills of the Missouri State Highway Patrol began working as an "undercover agent" in Newton County in late February, 1984. As a "cover," Mills occupied an apartment in Neosho, which he shared from June through September of that year with one Glenn Smith, a paid informant.

Mills testified that on September 21, 1984, he and Smith were in the apartment. Smith, at Mills' direction, telephoned defendant and arranged to meet him "near the Oklahoma state line in order to purchase two grams of methamphetamine." Mills and Smith went to the agreed site, met defendant, and Mills purchased two "packets of white powder" from defendant, paying him $200 that had been provided for Mills' use by the "Newton County Investigation Fund." According to Mills, he asked defendant "how pure the crank was." Mills quoted defendant as saying it was "77 percent pure," and that "it was good crank." Mills also recalled defendant saying he "was at the laboratory when it was weighed and tested."

On September 27, 1984, Smith arranged another meeting with defendant at a different location. During this encounter, Mills purchased a plastic bag containing "plant material" from defendant, paying him $80.

The substances purchased by Mills were subsequently tested at the Missouri State Highway Patrol laboratory. Those tests confirmed that the substance purchased September 21 was methamphetamine, and that the substance purchased September 27 was marihuana.

Defendant's first assignment of error is:

"The trial court erred to the defendant's substantial prejudice when it failed to sustain the defendant's motion to dismiss for misconduct by the State's agents because the testimony of ... Mills clearly indicated that informant Smith engaged in substantial illegal activity during the investigation of defendant in that the conviction of defendant

rests upon evidence obtained by outrageous conduct on the part of the State and the use of said evidence deprived defendant of his right to due process of law."

The point is based on Mills' testimony that Smith (a) was an "admitted drug user," (b) had no regular job, (c) got in a fight about a "girl friend" while he was "drinking," (d) was, at one time during the undercover operation, arrested pursuant to an Oklahoma warrant, and (e) had to be admonished by the landlord on one occasion to be quiet. Additionally, Mills disclosed that Smith had a "girl friend," who "came and went" at the apartment. Mills explained that he was gone "two or three days a week," and that Smith's girl friend stayed at the apartment when Mills was absent. Asked how much Smith was paid for his services as an informant during the six months he filled that role (April through September, 1984), Mills replied, "In the total period it was over $6,000."

Citing *State v. Hohensee*, 650 S.W.2d 268 (Mo.App.1982), defendant insists that "the use of a paid informant conducting a meretricious relationship in an apartment provided by the police; who is also an admitted drug user, and who is sought by law enforcement officers from a sister state is so outrageous as to offend traditional notions of due process."

At trial, defendant moved for dismissal of the information at the close of the State's evidence, advancing essentially the same argument he makes here. The trial court denied the motion.

Defendant maintains that the conduct of the State's "agents" in the instant case, while perhaps not as egregious as the conduct condemned in *Hohensee*, nonetheless compels reversal. We disagree.

In *Hohensee*, a police department made a deal with two ex-convicts whereby they, in return for leniency on a pending felony charge, would supply information to the police concerning ongoing criminal activity. The ex-convicts were paid weekly salaries by the police department, and worked under supervision of an undercover police officer.

The two ex-convicts and the undercover officer arranged with the accused to commit a burglary. The accused's role was to serve as lookout. The two ex-convicts forcibly entered a building and removed a safe, which the undercover officer helped load into a van. The building's owner knew nothing about the venture; consequently, the break-in was without the owner's consent. The safe was taken to a prearranged location, where the quartet opened it. The accused was eventually charged with, and convicted of, burglary in the second degree.

On appeal, this Court, in a comprehensive opinion by Flanigan, J., examined numerous cases where "outrageous conduct" by law enforcement officers had produced evidence vital for conviction. *Id.* at 270–74. The opinion held that the government action in sponsoring the acts of the two ex-convicts with respect to the break-in was outrageous and that due process barred the accused's conviction. *Id.* at 274[3]. The opinion emphasized that if the conduct of the two ex-convicts and the undercover officer, each acting as a salaried agent of the police department, were subtracted from the incident, what remained was the lone figure of the accused sitting in a parking lot a half block away. The opinion found it difficult to conceive a situation where the government's involvement could be greater or the accused's could be less, and the conduct of the latter still be subject to prosecution. *Id.* at 274.

■ An obvious and fundamental difference exists between the instant case and *Hohensee*. Here, none of the evidence that incriminated defendant was obtained by the conduct about which he complains, nor was such conduct the basis for either of the charges against defendant. That is, Smith's drug use, turbulent lifestyle, and licentious relationship with his concubine were not components of the crimes for which defendant was prosecuted. In *Hohensee*, the ex-convicts and the undercover officer orchestrated the criminal activity and assigned the accused a role in it, for which the accused was then prosecuted. Here, Smith's peccadilloes were unrelated

to the charges against defendant. The instant case is merely another illustration of the harsh reality that law enforcement agencies must, of necessity, utilize unsavory characters to locate, identify and apprehend drug pushers.

Defendant's reliance on *Hohensee* is misplaced. His first point is, accordingly, rejected.

Defendant's second point is:

"The trial court erred in overruling defense counsel's motion for *sua sponte* mental examination of defendant, because defendant's counsel requested the court to undertake an examination of defendant's mental state and the State did not object, and in support of his motion counsel informed the court as an officer of the court that he believed defendant was paranoid, delusional, and dangerous, in that Missouri law requires that when the court has reasonable cause to believe that a defendant as a result of mental disease or defect lacks capacity to stand trial the court shall order an examination of the defendant's mental state."

As best we can determine from the record furnished us, the attorney who represented defendant at trial [1] (henceforth referred to as "defense counsel") entered his appearance on March 11, 1985, seven months prior to trial.[2] The record is bare of any indication that the trial court, during that seven-month interval, was apprised by defense counsel that defendant—who was free on bond—was manifesting any mental abnormality.

On the morning of trial, after two verbal requests for continuance (for reasons irrelevant to this appeal) had been denied, defense counsel told the trial court there had been an "irreconcilable conflict" between him and defendant. Defense counsel said:

"[Defendant] fails and refuses to cooperate with me and take my advice. He's wild-eyed; he's red-eyed; he delirious; he's speaking audibly in the courtroom. His mother has advised me that she thinks he needs psychiatric help. That

he sees the stars moving and doing strange things in the sky.

The Sheriff's Department have warned me that he's dangerous. He carries a gun, that he's broken the jaw of his girlfriend [sic] who's sitting in the courtroom, and her jaw is wired right now.

He's failed to keep appointments at my office. He hasn't paid me my fee, and he's advised me this morning that I've thrown in with the Court and the Prosecutor, and he's very dissatisfied with my services. That I'm dishonest; that I haven't leveled with him; that the whole system is dishonest and stinks, and he is making numerous allegations about me as he did prior counsel who was in this case about six months ago.

. . . .

He will not take my advice; he refuses to attempt to understand the law, and he misapplies it. I believe that he's going to take the witness stand and prejudice his own case in front of the jury and the Court is going to find him in contempt of court.

He refuses to take my advice and I can't provide effective assistance and counsel for him."

The trial court evidently construed defense counsel's soliloquy as a request for leave to withdraw as defendant's lawyer, as the trial court stated, "Your request to withdraw is denied."

At that juncture, the transcript shows this:

"[DEFENSE COUNSEL]: I've indicated to the Court that Mr. Jay has indicated to me this morning that he's not satisfied with my services. That he doesn't feel like I've been a good lawyer, or that I'm honest, or that I've done a good job in the case, and he doesn't feel like he's going to get a fair trial.

And I think this matter should be put on the record. And ask Mr. Jay if this is true? Is this the way you feel? And is this what you've stated to me?

---

**1.** The attorney representing defendant on this appeal is not the attorney who represented defendant at trial.

**2.** Trial occurred October 8 and 9, 1985.

[DEFENDANT]: Yes, but I also said that you're as fair as I'm going to get in this courtroom. I want that stated on the record, too."

The trial court reiterated that defense counsel's request to withdraw was denied. Voir dire was then conducted and a jury was chosen, after which the trial court gave the mandatory instructions.[3]

Outside the presence of the jury, just prior to the prosecutor's opening statement, the following colloquy occurred:

"[DEFENSE COUNSEL]: Your Honor, I move the Court for a continuance and for a mental examination of my client. He's not competent to assist in his own defense. In my opinion, he suffers from a mental disease excluding responsibility. He's paranoia schizophrenia. He's accusing everybody of everything. His mother and wife or his girlfriend [sic], I've talked with over the noon hour and they think he's crazy.

I haven't had sufficient time to talk with him the last couple of weeks because he's refused to cooperate with me, so I haven't had a lot of contact with him. The contact I've had today, he's self-bent on destruction. He's not in his right mind. The things that he's saying are irrelevant and not responsive. And in my opinion he's crazy.

. . . .

He's paranoid. He thinks everybody is after him and everybody is watching him, and he hates everybody. And I can't be effective assistance or counsel to a crazy person.

THE COURT: He's appeared perfectly normal to me in the courtroom. I've been with him all morning. . . .

. . . .

[DEFENSE COUNSEL]: Everything he says is off the wall and not relevant such as a juror. He's complaining about the jury has been following him and his neighbors are surveilling him, and everybody is looking at him and taking pictures of him. And he wants me to call all kinds of witnesses to the witness stand. He's got 20 phone numbers now he wants me to go out and start calling people. He's given me people that he wants me to call as witnesses and their testimony, I can assure the Court, isn't relevant.

. . . .

The man, I don't believe he's acting. I think he's dangerous. I'm afraid of him. My secretaries are afraid of him. It depends on who's in his way at the time. He's been threatening to me, mildly. And I think the man—I think the man ought to be put away. I think if there's any way he ought to be confined for 30 days. He's on something. It isn't alcohol, but he's on pills. And I think he ought to be put away for some sort of an exam.

THE COURT: If he chooses to show up in Court in that condition, I can't accept that as an excuse to delay the proceedings."

Defense counsel responded with further comments similar to those quoted above, after which the trial court stated:

"Well, my inclination is to go ahead and proceed without more. If there, you know, comes a point in the trial where the situation calls for it, then I could have the jury go out and then question him. But this is pretty late date to be calling something like this to my attention.

. . . .

Because of the circumstances today I have seen nothing that would lead me to conclude—I've seen other Defendants who—I've seen Defendants who act stranger than this guy.

. . . .

I believe Mr. Warden, his previous attorney, had some problems with him, too. He seems to be—So far the two attorneys, from what you're saying and Mr. Warden said, he can't seem to get along with his own lawyer."

The trial then proceeded. There were no outbursts, disruptions or inapt comments by defendant. When the State rested around 4:00 p.m., the trial court announced

---

**3.** MAI–CR 2d 1.06 [1983 Revision], 2.01 and 2.02.

that the jury would be in recess until 9:00 a.m., the next day. After the jurors departed, the trial court and the attorneys discussed certain evidentiary matters, the overnight custody of the exhibits, and the verdict-directing instructions. During the discussion, the transcript shows this:

"THE COURT: Are you staying at the Defendant's house tonight?

[DEFENSE COUNSEL]: Yes, Your Honor, I am—" [4]

The trial resumed as scheduled, and proceeded to conclusion. No further mention was made of defendant's alleged mental abnormality.

Some nine weeks elapsed between the return of the verdict and the sentencing hearing. During that interval, no request was made of the trial court to order a mental examination of defendant.

At the sentencing hearing, one Edna Jean Stevens testified for defendant. She revealed she was a child welfare worker for the Oklahoma Department of Human Services. She further disclosed that she and defendant had "lived together for nearly four years." She stated: "Mr. Jay is not mentally ill; he's never been mentally ill.... He's not ill." Her testimony included this:

"Q. Did you ever discuss with [defendant] his right to testify or not testify?

A. Yeah. What we could we did.

Q. And you feel that Mr. Jay understood that he had the right to testify if he wanted to?

A. Yes, I realize that it was also discussed as possibly not in his best interest.[5]

. . . .

Q. You don't feel that your boyfriend, fiance, is mentally ill?

A. No, I don't.

Q. Have you ever felt that he was?

A. No."

Just prior to allocution, the prosecutor, referring to defense counsel's statements about defendant being mentally ill, stated, "I was here in court during the two days, obviously, of the jury trial; and I saw no observations that the Defendant was having any mental problems."

During allocation, defendant made an extensive and rational statement to the court, the gist of which was that he had been entrapped.

In support of his contention that the trial court erred in denying defense counsel's day-of-trial motion for mental examination, defendant cites two cases: *State v. Bolden,* 671 S.W.2d 418 (Mo.App.1984), and *State v. Moon,* 602 S.W.2d 828 (Mo.App.1980). Neither aids him.

In *Bolden,* the accused filed a motion for a psychiatric examination several weeks before trial, but never entered a plea of not guilty by reason of mental disease or defect excluding responsibility. On the day of trial, the court interviewed the accused, who answered lucidly and assured the court he understood the charge and had been able to discuss it with his attorney and assist in preparing a defense. The accused testified on his own behalf, and gave no indication of a lack of competence. He also spoke at the sentencing hearing, again manifesting an understanding of everything that had occurred. His contention on appeal that the trial court had erred in failing to order a psychiatric examination was rejected.

In *Moon,* the defendant entered pleas of not guilty and not guilty by reason of mental disease or defect excluding responsibility. At trial, however, his counsel was unaware of the latter plea, and affirmatively stated there had been no such plea. The trial court was aware that the accused, in connection with another charge, had been committed to a state hospital for mental evaluation. The circumstances of the offense charged (attempted robbery) were bizarre, and the accused's testimony was characterized by the appellate court as "faltering and wandering." In his testimony, the accused revealed he had been in

---

4. Defense counsel was from Springfield. The cause was tried at Neosho.

5. Defendant did not testify at trial.

two mental hospitals, once for over four months, and that he had been arrested for indecent exposure, and later arrested for molesting a minor. The opinion held that the above circumstances supplied reasonable cause to believe that the accused lacked competence to stand trial, and that the trial court should have conducted a hearing on that issue *sua sponte*.

In the instant case, defense counsel's comments at trial, standing alone, might arguably have given the trial court reasonable cause to believe that defendant, by reason of mental disease or defect, lacked fitness to proceed. § 552.020.2, RSMo Supp.1985. The trial court was not, however, obliged to consider those comments in isolation.

At defendant's arraignment, which took place ten months before trial, he entered pleas of not guilty to both charges. At no time thereafter did he plead not guilty by reason of mental disease or defect excluding responsibility, nor did he file a written notice of his purpose to rely on such defense. *See:* § 552.030.2, RSMo Supp.1985.

■ The record is barren of any hint that defendant, anytime during his life, had ever been examined, treated or hospitalized for any mental disorder. As noted earlier, defense counsel began his representation of defendant seven months prior to trial, and thus had ample opportunity to alert the trial court, in advance of trial, about any mental abnormality exhibited by defendant, yet counsel's first report on that subject came the morning of trial. Defense counsel's revelation to the trial court that he was staying that night at defendant's house belies defense counsel's professed fear of defendant.

Moreover, the trial court observed nothing abnormal in defendant's appearance or demeanor, and the prosecutor likewise observed nothing indicating defendant was having any mental problems. The evidence showed that defendant's conduct during the commission of the two crimes was that of a careful, street-wise drug seller. There was no intimation of delusional or irrational behavior.

We also cannot ignore the fact that during the nine weeks between verdict and sentencing, no request was made of the trial court to order a mental examination of defendant. Had defense counsel believed a mental examination would have shown that defendant lacked mental fitness to stand trial, counsel had abundant time after trial to request one. The amount of defendant's bond was increased after the verdict, and defendant was committed to jail by reason of inability to post the new sum. Consequently, he was readily available for a mental examination, had one been requested.

Additionally, Ms. Stevens (inferably the lady whose jaw, according to defense counsel, had been broken by defendant) insisted at time of sentencing that defendant was not mentally ill, and had never been mentally ill. Having lived with him, by her own admission, nearly four years, she had an infinitely better opportunity than defense counsel to acquaint herself with defendant's mental condition.

Finally, defendant's statement to the court during allocution manifested no confusion, misunderstanding or mental affliction.

The trial court is vested with broad discretion in determining whether to order a mental examination of an accused in a criminal case. *Howard v. State,* 698 S.W.2d 23, 25[10] (Mo.App.1985); *Bolden,* 671 S.W.2d at 419[2]; *State v. Beal,* 602 S.W.2d 22, 23[2] (Mo.App.1980). Given all the circumstances we have enumerated, the trial court could have reasonably found that the conduct which defense counsel reported to the trial court on the day of trial was an attempt by defendant to manufacture a ground for continuance or mistrial. *See: Howard,* 698 S.W.2d at 25.

On the record before us, we cannot convict the trial court of abuse of discretion in failing to grant defense counsel's motion for mental examination. Defendant's second point is without merit.

Defendant's third point complains that the trial court erred in refusing to instruct the jury on entrapment, MAI–CR 2d 3.28. The point is before us for plain error review only, inasmuch as the only reference

to the matter in defendant's motion for new trial was:

"That the trial court erred in failing to give 'Instruction A' the Entrapment Instruction, in that there was sufficient evidence to warrant the giving of such Jury Instruction, said Instruction attached hereto and marked 'Exhibit 1'."

In *State v. Sanders*, 541 S.W.2d 530 (Mo. banc 1976), a virtually identical paragraph in a motion for new trial was held insufficient to preserve for appellate review the contention that an instruction should have been given. The opinion held that to preserve the point, the averment should have set forth in detail and with particularity the specific grounds for the instruction, and that by failing to specify the facts that supported the instruction, the point was not saved. *Id.* at 532[1].

■ Entrapment, a "special negative defense," MAI–CR 2d 3.28, Notes on Use 5, is codified in § 562.066.2, RSMo 1978.[6] Defendant had the burden of injecting the issue of entrapment. § 562.066.4, RSMo 1978. To inject the issue, there must be proof of (a) inducement to engage in unlawful conduct, and (b) absence of a willingness to engage in such conduct. *State v. Willis*, 662 S.W.2d 252, 255[2] (Mo. banc 1983).

■ The only evidentiary support for an entrapment instruction mentioned in defendant's brief is that Mills "had to devote considerable energy to making contact with the Defendant." That assertion is based on Mills' testimony that prior to phoning defendant on September 21, 1984, Smith "had tried a couple of times in the past months and never was able to get a hold of him." That defendant may have been difficult to contact nowise establishes he was unwilling to sell controlled substances. Indeed, the evidence demonstrated the contrary. The first telephone contact resulted in the meeting at which defendant sold

Mills the methamphetamine, and there was no evidence that defendant had to be cajoled or wheedled into making the sale.

The circumstances of the sale, as related by Mills,[7] were that he and Smith met defendant near a liquor store in rural Newton County. Defendant summoned Smith to defendant's vehicle. The duo then drove away, returning a few moments later. Smith summoned Mills to defendant's vehicle, and introduced Mills to defendant. Smith or defendant then removed the packets of methamphetamine from a cigarette pack and handed them to Mills. As Mills examined the substance, defendant made the comments set forth in the third paragraph of this opinion. Mills then asked defendant the price, and defendant replied $200. Mills handed that sum to defendant. They then discussed whether defendant could provide additional methamphetamine, and what it would cost.

The circumstances of the marihuana sale, which we need not recite, likewise showed no unwillingness on defendant's part to sell the marihuana, and no persuasion or inducement on the part of Mills or Smith.

The issue of entrapment was consequently never injected into the trial, thus the trial court committed no error, plain or otherwise, in refusing to instruct on that issue.

Defendant's final assignment of error maintains that the trial court wrongly denied defense counsel's request to withdraw as defendant's lawyer. Defendant contends that an attorney who states that an irreconcilable conflict exists between him and his client, and that he cannot provide effective assistance of counsel to the client, cannot, as a matter of law, effectively assist the client. The only case relied on by defendant is *State v. Dean*, 400 S.W.2d 413 (Mo.1966), which defendant cites for the unassailable proposition that an accused is entitled to an attorney who gives his client

---

**6.** Section 562.066.2, RSMo 1978, states: "An 'entrapment' is perpetuated if a law enforcement officer or a person acting in cooperation with such an officer, for the purpose of obtaining evidence of the commission of an offense, solicits, encourages or otherwise induces another person to engage in conduct when he was not ready and willing to engage in such conduct."

**7.** Smith was not produced as a witness, and, as explained in footnote 5, *supra,* defendant did not testify.

his complete loyalty and serves his client's cause in good faith and to the best of his ability. *Id.* at 415[2].

Defendant emphasizes that defense counsel told the trial court that defendant would not cooperate, had not paid him, and had failed to keep appointments. Additionally, defense counsel revealed that defendant had accused him of being dishonest and in league with the State. Finally, says defendant, defense counsel professed fear of defendant, and harbored a belief that defendant had mental problems. Those circumstances, says defendant, demonstrate that defense counsel could not represent him with the fidelity required by *Dean.*

Curiously, despite defense counsel's report of enmity toward him by defendant, defendant did not, anytime before verdict, tell the trial court he wanted to discharge defense counsel. Instead, as noted earlier, defendant told the trial court that defense counsel was "as fair as I'm going to get in this courtroom." Only at time of sentencing did defendant ask that defense counsel be removed from the case.

In *State v. Olinghouse,* 605 S.W.2d 58 (Mo. banc 1980), the accused, during trial, pushed his attorney, causing him to fall. Simultaneously, the accused called the attorney a son of a bitch. The attorney moved for leave to withdraw, but leave was denied. On appeal, it was held that the attorney's request was addressed to the trial court's discretion, and that in view of the timing of the request, abuse of discretion had not been demonstrated. *Id.* at 70. The opinion noted that the trial court had earlier heard a pro se motion by the accused for change of attorney, and had concluded that the accused had shown no justifiable dissatisfaction with his attorney. *Id.*

■ In the instant case, had defense counsel been permitted to withdraw, the trial would have had to be aborted. The granting of a continuance that an accused might secure substitute counsel once trial has commenced is within the trial court's sound discretion, tempered by the public's need for effective administration of justice, and this discretion will not be lightly disturbed on appeal, especially when it appears the accused was not denied skilled and competent representation. *State v. Turner,* 623 S.W.2d 4, 11[10] (Mo. banc 1981), *cert. denied,* 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982); *State v. Gregory,* 595 S.W.2d 798, 800 (Mo.App.1980).

Here, defense counsel conducted a comprehensive voir dire of the jury panel, challenged certain veniremen for cause, objected to the court's removal of certain other veniremen for cause, exhaustively cross-examined Mills, the State's main witness, cross-examined other witnesses where appropriate, made pertinent objections, presented documentary evidence on behalf of defendant, and delivered a spirited final argument aimed at discrediting the State's case. We cannot say, on the record before us, that defendant failed to receive competent representation. If defense counsel's task was made onerous by defendant's pervicaciousness, the fault lies with defendant, not counsel.

■ Bearing in mind that (a) another lawyer had earlier seen fit to withdraw as defendant's attorney, (b) defense counsel had represented defendant for seven months without reporting any problems, (c) defendant showed no justifiable dissatisfaction with defense counsel, and (d) granting defense counsel's day-of-trial motion to withdraw would have compelled postponement of a case that had been awaiting trial for ten months and had already been continued twice, we cannot convict the trial court of error in denying such motion, particularly where the record does not establish that defense counsel rendered substandard service.

Defendant's final point is denied, and the judgment is affirmed.

GREENE, P.J., and MAUS, J., concur.

TITUS, J., not participating.