**STATE of Missouri,
Plaintiff–Respondent,**

v.

**John Earl MANNS,
Defendant–Appellant.**

No. 15135.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 19, 1988.

Motion for Rehearing or to Transfer
Denied Feb. 9, 1988.

Application to Transfer Denied
March 15, 1988.

Calvin R. Holden, Springfield, for defendant-appellant.

William L. Webster, Atty. Gen., Elizabeth Levin Ziegler, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Judge.

A jury found defendant John Earl Manns guilty of two charges of selling marijuana, four charges of selling cocaine, and one charge of distribution and delivery of marijuana. On the last-named conviction he was sentenced, as a prior and persistent offender, to 10 years' imprisonment, that sentence to run consecutively to the six concurrent sentences of 20 years each imposed on the other six convictions. All of the preceding sentences run consecutively to other sentences now being served. Defendant appeals.

The information, which also included the prior and persistent offender allegations, nay be summarized as follows:

| Count | Date of Offense | Offense | Buyer or Recipient |
| --- | --- | --- | --- |
| I | April 6, 1986 | Sale of marijuana | Trooper Wilson |
| II | April 19, 1986 | Sale of cocaine | Trooper Wilson |
| III | May 8, 1986 | Sale of cocaine | Officer Maples |
| IV | May 30, 1986 | Sale of cocaine | Officer Ijames |
| V | June 3, 1986 | Sale of cocaine | Officer Ijames |
| VI | June 3, 1986 | Sale of marijuana | Officer Ijames |
| VII | June 4, 1986 | Distribution and delivery of marijuana | Officer Ijames |

Defendant's first point is that the trial court erred in refusing to give, at defendant's request, an entrapment instruction with respect to Counts I through VI. An entrapment instruction was given with respect to Count VII. It is the position of defendant that the evidence was sufficient to support an entrapment instruction on each of the first six counts.

"An 'entrapment' is perpetuated if a law enforcement officer or a person acting in cooperation with such an officer, for the purpose of obtaining evidence of the commission of an offense, solicits, encourages or otherwise induces another person to engage in conduct when he was not ready and willing to engage in such conduct." § 562.066.2.[1]

Missouri follows the "subjective" test on entrapment, which focuses on the "origin of intent" to commit the crime with emphasis on the predisposition of the accused. *State v. Willis*, 662 S.W.2d 252, 254 (Mo. banc 1983). The subjective test, in addition to requiring a showing of inducement to engage in unlawful conduct, also requires a showing of defendant's lack of predisposition to commit the offense. *State v. Wells*, 731 S.W.2d 250, 251 (Mo.banc 1987). This requires an examination of defendant's background "and his reluctance to commit the offense." *Id.*

"The statute, § 562.066, requires proof of *both* inducement to engage in unlawful conduct *and* an absence of a willingness to engage in such conduct." (Emphasis in original.) *State v. Willis*, supra, at 255. "[I]t is the defendant's initial burden to go forward with evidence showing both unlaw-

1. All references to statutes are to RSMo, 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

ful governmental inducement and defendant's lack of predisposition. The State then has the burden of proving lack of entrapment beyond a reasonable doubt. The State may do so by rebutting either defendant's evidence of inducement or by showing his predisposition." *Id.*

"In deciding if the evidence supports the submission of an entrapment instruction, *the court should confine itself to the testimony favorable to defendant....* The jury alone must pass upon the credibility of the witnesses." (Emphasis added.) *State v. Wells, supra,* at 251.

Except to the limited extent that defendant's fifth point challenges the conviction on Count VII, defendant does not claim that the evidence is insufficient to support the verdict. All of the offenses occurred at defendant's home at 630 Missouri in Springfield. In each instance, the buyer of the controlled substance was an undercover law enforcement officer.

On April 6, 1986, Trooper Wilson, accompanied by "a confidential informant," went to defendant's home. Wilson told defendant he was there to purchase one ounce of marijuana and that if defendant did not trust him, Wilson would leave. Defendant said he knew Wilson's companion and trusted him. The informant told defendant that Wilson "was trustworthy enough to deal with." Defendant remarked to Wilson that he (defendant) had to be careful "because there are a lot of undercover police around." Wilson testified, "After defendant felt comfortable with me, he was not reluctant at all to sell drugs to me." Defendant told Wilson he would sell him one ounce of marijuana for $120. Defendant walked to a back bedroom, followed by Wilson. On a small table in the bedroom was a set of scales, graduated in grams. Also on the table was "a rather large pile of marijuana." Defendant weighed out 29 grams, "bagged it," and gave it to Wilson in return for $120.

On April 19, Trooper Wilson again went to defendant's home. In addition to defendant, two other black men were there. Wilson told defendant he wanted to buy another ounce of marijuana. Defendant said he did not have any marijuana at that time, but did have some cocaine which he would sell for "$60 a half-gram." Wilson asked defendant if he had a gram or two half-grams, and defendant said he did. Wilson said he would like to see it. Defendant walked to the same bedroom and "within seconds" came back with two aluminum foil packets. Wilson opened one of the packets. It contained a paper packet which in turn contained a white powder. As Wilson examined it, defendant pointed out certain characteristics about it. "There was a hard substance of cocaine in there which [defendant] called rock—a pure form." Defendant told Wilson that he bought cocaine in "8–ball quantities"—⅛ of an ounce—and that he did not dilute it or "cut it in any way," but just divided it into smaller quantities for sale. Wilson told defendant he would take it, and paid defendant $120. As Wilson was leaving, defendant asked him if Wilson "shot it intravenously." Wilson told him he did not. Defendant said one of the men there, "Doc," would "shoot [Wilson] up painlessly if [Wilson] wanted to try it intravenously."

On May 7, Officer Maples went to defendant's home. Maples, with whom defendant was not acquainted, asked defendant if he had drugs for sale and defendant said, "Yes." Defendant told Maples he was interested in trading two grams of cocaine for a weapon, preferably a .357 Magnum. Maples told defendant he would see what he could do and would contact him the next day.

On May 8, Maples, with another undercover officer, went to defendant's house. Maples told defendant that the supplier of the gun wanted to test the cocaine, and defendant gave Maples a sample of less than a quarter of a gram for that purpose. Maples told defendant "he wanted to buy a quarter gram for his personal use," and defendant sold Maples an additional quarter gram of cocaine for $25. Defendant told Maples he wanted to kill a business associate, Dino, who had "messed him up on another drug deal."

On May 30, Officer Ijames, accompanied by David Van Winkle, went to defendant's

home. A boy admitted the two men to the kitchen. A woman came in and she and the two men discussed "various things, including the price of cocaine." A few minutes later, defendant came in from the bedroom and "talked about cocaine and pricing." Defendant said "all he had was a 50-cent piece—meaning a price of $50." Ijames paid defendant $50 and defendant gave him the cocaine.

On June 3, Officer Ijames went to defendant's home and knocked. Someone said, "Come in." Ijames entered the kitchen. Defendant, who was in the bedroom, told Ijames to come on back. Ijames said he wanted to buy some cocaine. Defendant said he had "a 25-cent piece and a 30-cent piece." Defendant produced two packets of cocaine from a jewelry box from a dresser. Ijames paid defendant $55, and defendant gave him the packets. Defendant said he had some marijuana, and opened the bottom drawer of the dresser. There Ijames saw "a large quantity, 70 to 75 quarter ounce bags," of marijuana. Defendant said the bags were $20 apiece and that possibly a pound might be available later. Ijames paid defendant $20 for a quarter ounce bag of marijuana. Ijames asked about getting a pound, "if I liked the quality and if I could make any money selling it," and defendant said, "Come back tomorrow."

On June 4, Ijames went to defendant's house. Defendant told him a pound of marijuana was available but he would have to come back the next day and get it, and defendant would have to have all the money. Defendant said he would sell a pound for $150. Ijames paid him $150.

On June 5, Ijames went to defendant's house. Defendant told him that he was able to get a pound, and handed Ijames a paper bag containing a pound of marijuana. Ijames said, "[Defendant] led me to believe it came from a neighbor lady. He would deliver the money to her and she would have to go get it."

Defendant, testifying in his own behalf, admitted that he had three prior burglary convictions, that in 1967 he was convicted in Michigan for felonious assault "but this was reversed," and that in 1974 he was convicted in Missouri of armed robbery and "I am doing that time now."

Defendant testified, "I have never in my life telephoned anyone to try to sell drugs to them and never contacted in person anyone to sell drugs to them. I don't know the first thing about drugs. I was only doing this, what I did, I did it through request, people coming to me and asking me to do this, and I figured I was doing them a favor—you know—friends. I have never made any monetary gain from any of these transactions." Defendant admitted selling the various controlled substances to Wilson, Maples, and Ijames, but said that he did so, on each occasion, "at his request." With regard to the June 5 delivery of marijuana, defendant testified that his next door neighbor, a woman, was the one who delivered "the 428 grams of marijuana" to Ijames and that the neighbor "was the one that received the $150." Defendant admitted he was present during that transaction.

■ In support of his first point, defendant points to his testimony set forth in the preceding paragraph.[2] This court holds that the evidence was insufficient to support an entrapment instruction on each of the first six counts. Specifically, there was no showing of "an absence of a willingness to engage in such conduct." *State v. Willis, supra.*

■ On April 6, Trooper Wilson's *initial* visit, defendant sold him one ounce of marijuana for $120, after using a set of scales to measure the amount. Although defendant expressed apprehension because "there are a lot of undercover police around," there was no showing of an unwillingness to sell. A seller is not unwilling merely because he is cautious.

2. Defendant's reference to the June 5 incident misses the mark because that incident concerned Count VII and the court gave an entrapment instruction with respect to that count. It is unnecessary for this court to express an opinion on whether defendant was entitled to the given instruction.

In none of the sales did defendant state or otherwise manifest an unwillingness to make the sale. The failure of the evidence, viewed favorably to the defendant, to show an absence of a willingness to sell invalidates defendant's first point, and it is unnecessary to consider whether the evidence was sufficient to show inducement on the part of the officers for defendant to engage in the unlawful sales. As stated in *State v. Jay,* 724 S.W.2d 293, 300 (Mo.App. 1987), however, "there was no evidence that defendant had been cajoled or wheedled into making the sale[s]."

The trial court properly refused to give an entrapment instruction with respect to Counts I through VI. *State v. Willis, supra; State v. Jackson,* 731 S.W.2d 348 (Mo.App.1987); *State v. Johnson,* 728 S.W. 2d 675, 679[4] (Mo.App.1987); *State v. Jay, supra,* at 299–300[3]. Defendant's first point has no merit.

■ Defendant's second point is that the trial court erred in denying his written motion "to sever for separate trials" the seven counts of the information "because the evidence as to each count was not of a common scheme or plan, or the same transaction, and the complexity of the evidence made it impossible for the [jury] to distinguish the evidence and intelligently apply the law to each offense, thereby clearly resulting in prejudice to the defendant."

Rule 24.07 reads:

"When a defendant is charged with more than one offense in the same indictment or information, the offenses shall be tried jointly unless the court orders an offense to be tried separately. An offense shall be ordered to be tried separately only if:

(a) A party files a written motion requesting a separate trial of the offense;

(b) A party makes a particularized showing of substantial prejudice if the offense is not tried separately; and

(c) The court finds the existence of a bias or discrimination against the party that requires a separate trial of the offense."

The hearing on defendant's motion was held on the morning of the first day of the two-day trial. Defendant's counsel, who offered no evidence in support of the motion, argued that the seven counts were unrelated; "they are different incidents entirely, they do not show a common scheme or plan and [it] would be highly prejudicial to the defendant, because the jury will have all seven of them presented to them at one time versus them reviewing one count on each set of facts and making a decision on one count." Counsel also informed the court that he "contemplated" a defense of entrapment which would "go to each count." Counsel stated, "With the defense of entrapment, I think it would be very difficult for the jury in a complicated seven-count sale and distribution information, to be able to sort out all the different items that are going on in each count."

In denying the motion, the court said:

"[T]he Court is persuaded that because there is expected to be a defense of entrapment as to each of these counts, that in fact there will be no substantial prejudice if the counts are tried together. ... The Court also does not believe there is any bias or discrimination between— against the party which requires a separate trial. As the evidence proceeds, it sounds to me as though, if we tried one of these cases, the evidence of all of the other sales that are alleged here would be admissible at some stage, certainly after the entrapment defense is presented.[3] And, in fact, in charging seven counts in the same trial, it seems to me it's probably beneficial to the defendant, because it may open up to the defendant something that would not be available in a separate—if each count were tried separately, and that is the contention that is

---

3. Supporting the trial court's statement is *State v. Schoenhals,* 715 S.W.2d 583, 586 (Mo.App. 1986), where this court cited with approval "overwhelming federal and out-state authority holding that when the defense is entrapment, the state may introduce, on the issue of predis-

position, evidence of an offense committed subsequent to the one on trial, at least if the subsequent offense is similar in nature and reasonably proximate." *Of course the same is true* with respect to a prior offense.

frequently made by defendants that the state is guilty of overcharging and being oppressive with the charges that it has filed."

■ Whether separate trials should be ordered is addressed to the sound discretion of the trial court under the guidelines contained in Rule 24.07, and a trial court should weigh the benefit of saving judicial time by trying the offenses together against the potential prejudice to defendant. *State v. Davis*, 738 S.W.2d 517 (Mo. App.1987). In that case this court held that the trial court committed reversible error in not sustaining a motion for separate trials with respect to charges arising out of two separate armed robbery incidents. The court said, at p. 518: "The crimes here were not so similar that evidence of either would have been admissible in a separate trial of the other to show a common scheme or plan or to prove identity. That would have eliminated any prejudice to defendant." The court said, at p. 519: "[U]nless the evidence showing each of the crimes would have been admissible in the other, then ordinarily the defendant is prejudiced by trying the cases together."

Unlike the situation in *State v. Davis,* the trial court, at the time it made its ruling on the motion, was under the impression, based on defense counsel's statements concerning entrapment, that evidence concerning the offense in each count would be admissible on the trial of any other count, even if the latter were severed. It is true, as this court has held, that at least with respect to Counts I through VI the evidence did not justify the submission of an entrapment instruction, but the trial court had no way of knowing that when the motion was ruled.

The "a common scheme or plan" terminology in defendant's second point is found in Rule 23.05 which deals with the propriety of joinder of offenses in the information. Defendant has raised no question with regard to the fact that the seven offenses were pleaded in one information. Defend-

ant challenges the propriety of a ruling with regard to separate trials under Rule 24.07, which is a different matter.[4]

The record undermines defendant's assertion with regard to the alleged "complexity of the evidence." The state's evidence consisted of the three officers who made the purchases, a fourth officer who accompanied Maples on May 8, and laboratory technicians who identified the substances as cocaine and marijuana. The basic issues submitted to the jury were few and simple. Indeed the jury required only 35 minutes to reach its verdict. Defendant's second point has no merit.

■ Defendant's third point is that the trial court erred in "permitting" the state to cross-examine defendant concerning details of the drug transactions named in the seven counts "because said cross-examination ... exceeded the scope of defendant's direct examination in violation of § 546.260."

Section 546.260 reads, in pertinent part:

"1. No person shall be incompetent to testify as a witness in any criminal cause or prosecution by reason of being the person on trial ..., but any such facts may be shown for the purpose of affecting the credibility of such witnesses; provided, that no person on trial or examination, nor wife or husband of such person, shall be required to testify, but any such person may testify at his or her option either on behalf of or against the defendant, and shall be liable to cross-examination, as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness in the case; ..."

The direct examination of defendant, who testified on his own behalf, included the following:

"Before I was incarcerated I lived at 630 South Missouri. *I have never telephoned anyone to try to sell drugs to them. I have never contacted in person anyone to sell drugs to them.* I was

4. For a discussion of the distinction between proper joinder of charges under Rule 23.05 and separate trials of offenses under Rule 24.07 see

*State v. Smith,* 682 S.W.2d 861, 863 (Mo.App. 1984); *State v. Southern,* 724 S.W.2d 605, 607, fn. 2 (Mo.App.1986).

arrested on June 12. On that day or the next day I met with Detective Thomas at the jail. Thomas asked me about dealers and drug dealers in Springfield. He wanted me to find *other* dealers for him. Thomas had something that they were supposed to have taken out of my apartment. Thomas told me: 'You tell us where you'—he said—no, he said, in other words, '*We know that you are not the main source, that you are not the dealer.*' In other words he was saying, he said, 'but if you tell us who the dealers are, we will let you go.' " (Emphasis added.)

On cross-examination by Prosecutor Martin the following occurred:

Q. Mr. Manns, do you deny that you sold drugs to Officer—to Trooper Wilson on August—excuse me, on April the 6th—

A. No, sir, I—

MR. HOLDEN: Excuse me. Your Honor, I'm going to object, that's outside the scope of the direct.

THE COURT: The objection is overruled.

Q. (By the prosecutor) Do you deny that you sold drugs to Trooper Wilson on April the 6th, 1968?

A. No, sir, I'm not denying it. In fact, I did the transaction, but—

Similar questions and objections took place with respect to the offenses charged in the other counts.

Defendant makes no claim that his constitutional privilege against self-incrimination was infringed, and properly so. *State v. Dean*, 400 S.W.2d 413, 416[6] (Mo.1966). His point is based upon an alleged violation of the scope of cross-examination permitted by § 546.260.

In connection with that statute, the supreme court has said:

"In the cross-examination of a defendant who testifies in his own behalf the prosecution is not confined to categorical review of the evidence given by defendant on direct examination but may examine him in detail as to matters generally referred to in his examination in chief.... Thus, if in direct examination

defendant refers in a general way to a subject, he may then be cross-examined in detail on that subject.".

*State v. Murphy*, 592 S.W.2d 727, 731 (Mo. banc 1979).

The cross-examination "may extend to any matter referred to or within the fair purview of [direct] examination." *State v. Mayo*, 487 S.W.2d 539 (Mo.1972). If the defendant "enters a sweeping denial of the charge," the state may cross-examine him "in detail as to matters generally referred to in the examination in chief." *State v. Lamborn*, 452 S.W.2d 216 (Mo.1970).

Section 546.260 and the cases construing it do not "give us any yardstick by which we can accurately measure the breadth of a cross-examination and tell clearly whether its proper scope has been infringed. It is probably impossible to lay down any definite rule. Each case is very much dependent upon its own facts and background." *State v. Scown*, 312 S.W.2d 782, 786 (Mo.1958). See also *State v. Moss*, 700 S.W.2d 501, 505 (Mo.App.1985). The extent of cross-examination of an accused rests largely in the discretion of the trial court, and an appellate court will not interfere unless that discretion is abused. *State v. Dunn*, 577 S.W.2d 649, 653[3] (Mo. banc 1979); *State v. McClintic*, 731 S.W.2d 853, 856–857 (Mo.App.1987).

Defendant's brief argues that his direct examination was limited to the statements "I have never telephoned anyone to try to sell drugs to them. I have never contacted in person anyone to sell drugs to them." As shown above, however, defendant's direct testimony was not so limited. He testified, through the statement he himself attributed to Detective Thomas, that he, defendant, was "not the dealer." The reference, of course, as shown above, was to being a drug dealer. The fair import of that segment of defendant's direct testimony was that he was denying that he dealt in drugs. That denial permitted the state to examine him in detail as to his status as a drug dealer. *State v. Lamborn*, supra.

Defendant would construe his testimony concerning not "telephoning," and not

"contacting in person" anyone to sell drugs to be something other than a denial or admission that he sold the drugs as charged in the information. If those statements were denials that he was a drug dealer, the cross-examination was proper. If the statements were admissions that he was a drug dealer, the cross-examination was non-prejudicial.

■ Defendant is seeking to have his cake and eat it too. The defense of entrapment, to which defendant argues he was entitled under his second point, is not available to one who denies his guilt, *State v. Sykes*, 478 S.W.2d 387 (Mo.1972); *State v. Williams*, 542 S.W.2d 3 (Mo.App.1976), yet defendant, by a self-serving construction of a portion of his direct testimony, seeks to ride his horse in two directions—he was not guilty, and he was guilty but entrapped.

This court holds that the trial court did not abuse its discretion in permitting the challenged cross-examination. Defendant's third point has no merit.

■ Defendant's fourth point is that the trial court erred in denying his motion for mistrial based on the following incident:

Q. (By Prosecutor Martin) Sir, isn't it true that you were convicted of felonious assault in Jackson, Michigan in 1967?

A. MR. HOLDEN: Your Honor, I would object, his background on those convictions is not relevant to the charges here today.

THE COURT: The objection is overruled.

Q. (By Mr. Martin) Sir?

A. Yeah, this was reversed.

Q. But you were convicted of it, is that correct?

A. Yes, at the time.

Q. And isn't it true that you were convicted of—

THE COURT: Will the attorneys come around a minute with the court reporter?

\* \* \* \* \* \*

(Counsel for the Plaintiff, counsel for the Defendant, and the court reporter approached the Bench and the following proceedings were had and entered of record):

MR. HOLDEN: Your Honor, I'm going to ask for a mistrial, he's brought up a conviction that may have been reversed.

THE COURT: That's the reason I asked you to come around. Mr. Martin, the witness says that has been reversed. What information do you have on that?

MR. MARTIN: I don't have anything to indicate that. I have a copy from the Michigan Department of Corrections that shows admitting him to the prison, it doesn't show that it was reversed.

THE COURT: That was a 1967 matter?

MR. MARTIN: I believe it was, Judge.

MR. HOLDEN: Part of the trouble with that conviction is that they have lost all their records from that time period. All they have is a card left on him.

The court denied the motion for mistrial but instructed the jury to disregard "any question and answer concerning a 1967 felonious assault conviction in Jackson, Michigan."

As stated earlier in this opinion, the defendant admitted that he had three prior burglary convictions and that in 1974 he was convicted in Missouri of armed robbery and "I am doing that time now."

It is true, as defendant argues, "that if an appellate court reverses a conviction outright, or reverses and remands the case for a new trial, the original conviction is wiped out and after the date of the appellate decision may not be shown for impeachment purposes." *State v. Blevins*, 425 S.W.2d 155, 158[1] (Mo.1968).

It will be observed that defense counsel made no objection to the testimony concerning the Michigan conviction based on the ground that it had been reversed. Further, the only evidence that it had been reversed was the unsupported testimony of defendant. Defense counsel moved, somewhat belatedly, for a mistrial, and that motion was denied.

Even if it be assumed that the Michigan conviction had been reversed, and the trial court gave defendant the benefit of his unsupported testimony to that effect by instructing the jury to disregard the Michi-

gan conviction, there was no prejudicial error. "The use of invalid prior convictions is harmless where the evidence against the defendant is strong and where, as here, valid convictions are also used to impeach the credibility of the defendant." *State v. Ritterbach*, 637 S.W.2d 820, 824[11] (Mo. App.1982). See also *Richardson v. State*, 617 S.W.2d 76, 78[6] (Mo.App.1981). Defendant's fourth point has no merit.

Defendant's fifth point is that the trial court erred in failing to sustain his motion for judgment of acquittal with respect to Count VII on the ground that there was a variance between the information, which alleged the delivery took place on June 4, 1986, and the evidence, which showed that the delivery took place on June 5, 1986. Time was not of the essence of the offense charged in Count VII, and the alleged variance was not fatal. *State v. Payne*, 452 S.W.2d 805, 809[12] (Mo. 1970); *State v. Rocha*, 526 S.W.2d 834, 838[16] (Mo.App.1975); *State v. Summers*, 489 S.W.2d 225, 227 (Mo.App.1972). Defendant's fifth point has no merit.

The judgment is affirmed.

PREWITT, P.J., and HOGAN and MAUS, JJ., concur.