STATE of Missouri, Respondent,

v.

**Eddie Warren GLESSNER, Appellant.**

**Eddie Warren GLESSNER, Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. 19407, 20075.**

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 27, 1996.

David Simpson, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, David G. Brown, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Appellant, Eddie Warren Glessner, guilty of three crimes:

Count I: attempt to commit robbery in the first degree;

Count II: armed criminal action;

Count III: tampering in the first degree.

The jury assessed punishment at nine years' imprisonment on Count I, seven years' imprisonment on Count II, and two years' imprisonment on Count III. The trial court imposed those sentences, ordering that they run consecutively. Appellant brings appeal 19407 from that judgment.

While that appeal was pending, Appellant filed a motion to vacate the judgment and sentences per Rule 29.15.[1] Following an evidentiary hearing, the motion court issued findings of fact and conclusions of law, and denied relief. Appellant brings appeal 20075 from that judgment.

We consolidated the appeals, Rule 29.15($l$), but address them separately in this opinion.

### Appeal 19407

Two of the four points relied on in Appellant's brief pertain to this appeal. Point I avers the trial court erred in overruling Appellant's objection when the prosecutor, during cross-examination of Appellant, asked why Appellant "failed to make an exculpatory statement after his arrest." Point II maintains the trial court erred by failing to ex-

---

1. Rule references are to Missouri Rules of Criminal Procedure (1994) except in footnote 8, *infra.*

clude the victim's "in-court identification" of Appellant in that "its reliability was tainted by impermissibly suggestive pretrial identification procedure."

Because Appellant does not challenge the sufficiency of the evidence to support the verdicts, we set forth only the evidence essential to a discussion of the claims of error.

Viewed favorably to the verdicts, *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995), the evidence establishes that Steven Michael Appleby, a part owner of Woodside Surplus City, arrived by automobile at that site between 6:50 and 7:00 a.m., Saturday, October 13, 1990. As he exited his vehicle to open the gate of a security fence, a man approached on foot holding a handgun. The gunman was wearing a "military type boony hat" that covered his forehead. Appleby observed the gunman "had a beard and moustache growth."

The gunman demanded that Appleby "go in the store and get the . . . money."

Appleby told the gunman he (Appleby) could not get into the store.

The gunman persisted in his demand. Appleby gradually backed away and, when 25 to 30 feet from the gunman, turned and ran. He looked back and saw the gunman enter his (Appleby's) automobile and drive away (Appleby had left the motor running).

Appleby ran across a street to Frank's Market. A Ford automobile driven by a blond woman drove away from the market at high speed, "almost brushing" Appleby. He "wrote down the license plate number," then entered the market and phoned the Greene County sheriff's office.[2]

Deputy Sheriff Bill Harp was one of the officers dispatched to the scene. Appleby gave Harp the Ford's license number.

Within an hour after the gunman fled, officers found Appleby's automobile, abandoned, two blocks south and a block and a half east of Woodside Surplus City.[3]

At the sheriff's office, Appleby described the gunman to Detective Tom Thorson, who used an "identikit" to construct a "composite likeness" of the gunman.

Meanwhile, Deputy Sheriff Harp had learned the license number on the Ford was registered to Paula Jager, 1107 South Colgate, Springfield. Jager had been employed at Woodside Surplus City from May to August, 1990.

Harp went to the South Colgate address, a single family home some ten blocks from Woodside Surplus City. Arriving around 9:00 a.m., Harp knocked on the door but "couldn't raise anyone." He saw no vehicle in the driveway. A single car garage had "something over the windows, so you couldn't see in."

Around 10:30 a.m., Deputy Sheriff Gary McMurtrey was on patrol when he received a dispatch regarding the license number seen by Appleby on the Ford that sped from Frank's Market.

McMurtrey, northbound, saw a Ford bearing that number ahead of him, also northbound. He followed it until it stopped where a crowd had gathered at a garage sale, some nine blocks from Paula Jager's residence. Appellant was the Ford's driver and sole occupant.

McMurtrey summoned Appellant to McMurtrey's vehicle, noting Appellant "had some nicks on the side of his face and . . . was clean shaven and it looked like he had cut himself on the side of his neck." McMurtrey took Appellant into custody.

Harp and other officers arrived. Appellant was taken to the sheriff's office, and the Ford was towed to the sheriff's "service center."

Around noon, Appellant was placed in a lineup of "six or seven" men at the sheriff's office. Appleby viewed the lineup, but did not identify Appellant or anyone else as the gunman. Appleby's testimony:

"Q. What do you recall about the lineup . . . how it was conducted?

2. Woodside Surplus City is located "barely outside the city limits of Springfield" in Greene County.

3. The unauthorized use of Appleby's automobile was the basis of the tampering conviction (Count III).

A. ... a deputy sheriff ... told me not to be upset, not to be nervous, but try to be positive to identify, and ... when I actually went in to the lineup the suspect seemed to have changed his appearance.

Q. Well, which one of those at the time appeared to be the one?

A. I ... told them ... that none of them really appeared to be him with the change that had taken place.

Q. What change did you think had taken place?

A. A real, very clean shaven gentleman. The outfit he had on was not there. He had a hat over his forehead where I couldn't tell if he had, you know, balding hair or long hair or what. So I actually said, you know, there's quite a bit of a change from the morning of the suspect I had seen and that afternoon.

Q. Well, were you referring to any particular person?

A. I actually just said they all looked clean shaven....

Q. And after you looked at this ... lineup at the Sheriff's Office, after you were done and couldn't pick anybody out, that was when Detective O'Neal said you didn't pick him out?

A. Yes. I told him one gentleman looked like it, you know, in the lineup, but I said, 'I don't think that's him.'

Q. Okay. And his response to you was?

A. He said, 'Well, that's not him.' ..."

By early afternoon, Detective Thorson had obtained a search warrant for Paula Jager's residence and the impounded Ford.

Thorson, accompanied by Detective James O'Neal and other officers, went to the residence. No one was inside.

The officers conducted a search. In the bathroom, they found a razor, shaving soap, scissors, and other items. According to O'Neal, the scissors had hair "sticking out the right side ... an inch above the screw." The razor also had "hair in it."

After searching the house, Thorson and O'Neal searched the impounded Ford. They found a loaded handgun in a bag in the trunk. O'Neal described the gun as a ".380 Walters nine millimeter Kurz." Thorson showed the gun to Appleby, who concluded it was "like the gun that I saw that morning."

Dwayne Alan Hayes, a "floor manager" at Woodside Surplus City, and Robert Brian Fairless, a sales clerk there, knew Appellant by having seen him in the store during Paula Jager's employment. Hayes explained: "[Appellant] would come in ... basically every day to pick [Paula] up at dinner time, eat dinner with her on the front parking lot at the store."

Hayes was on duty at the store Friday, October 12, 1990, the day before Appleby's encounter with the gunman. Sometime after 7:00 that evening (October 12), Hayes saw Appellant enter the store and walk "back towards the office area." Hayes noticed Appellant "had a rough beard." Hayes recalled, "I'd never seen Eddie with a rough beard, I'd always seen him pretty clean shaven in the past."

According to Hayes, Appellant was in the store "ten to fifteen minutes." When Appellant exited, Hayes saw him enter a Ford and drive away. At trial, Hayes was shown a photograph of the Ford Appellant was driving when arrested by Deputy Sheriff McMurtrey. Hayes avowed it looked like Paula Jager's Ford, and was the vehicle Appellant drove upon leaving the store October 12.

Like Hayes, sales clerk Fairless was on duty at the store Friday evening, October 12. When Appellant arrived, Fairless was outside and saw the vehicle Appellant was driving. Fairless followed Appellant into the store and watched as Appellant walked "back by the office." Fairless noticed Appellant "had a ... beard growth, like going deer hunting." At trial, Fairless was shown a photograph of the Ford Appellant was driving when arrested. Fairless identified the vehicle in the photograph as the one Appellant "drove up in on Friday night, the 12th."

Fairless was at the store the next day (October 13) when Appleby was describing the gunman to investigators. Upon hearing Appleby's description, Fairless told the investigators that the gunman "was in the

night before," and gave the investigators Appellant's name.

On October 23, 1990, ten days after Appleby's encounter with the gunman, Detective O'Neal showed Appleby five or six photographs. Each was of a different individual. All of the individuals "had moustaches, beards." The individual in one of the photographs was Appellant. Appleby identified that photograph as a photograph of the gunman.

At trial, Appleby pointed to Appellant and swore he was the gunman. Asked how he was able to identify Appellant's photograph, Appleby explained: "[H]e had a moustache and a beard growth and it just appeared to be the same gentleman that I had seen the morning of October 13th, less the boony hat covering his head, his hairline."

During Hayes' testimony, the prosecutor showed him the photograph of Appellant identified by Appleby on October 23 and asked how it compared with Appellant's appearance when Hayes saw Appellant October 12. Hayes replied: "Very similar. The beard was probably not quite as heavy as that. That's a black and white picture, so . . . his beard was probably not quite that heavy that evening that I saw him."

Appellant filed a pretrial motion to suppress the "in-court or out-of-court identification" of him by Appleby, maintaining the identification procedures used by investigators "were so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable misidentification."

The trial court denied the motion after an evidentiary hearing. Appellant preserved the issue by objecting at trial when Appleby identified Appellant as the gunman.

■ Appellant's second point, which we address first, asserts the trial court erred in refusing to exclude Appleby's in-court identification of Appellant in that such identification was unconstitutionally suggestive because:

" . . . on the same day of the robbery attempt, Appleby was unable to pick Ap-

pellant out of a live lineup in which Appellant provided a voice sample, that Appleby told a detective at the live lineup that one person 'looked like' the suspect and the detective told Appleby, 'Well, that's not him', that after Appleby was unable to pick out Appellant he was told that his description of the suspect fit Appellant 'to a "T" ', and that ten days later Appleby picked out a photo of Appellant in a photographic lineup."

As we comprehend Appellant's second point, his theory of error is that Appleby's in-court identification of him was tainted by two instances of improper conduct by investigators. First, according to Appellant, when Appleby, upon viewing the lineup October 13, 1990, said a person other than Appellant looked like the gunman, a detective told Appleby, "Well, that's not him."

Appellant's description of the incident is misleading. Appleby's testimony about the dialogue between him and the detective is quoted earlier in this opinion.[4] A careful reading of that testimony reveals Appleby told the detective that although one man in the lineup looked like the gunman, Appleby did not think the man was the gunman. That is the remark to which the detective, according to Appleby, responded, "Well, that's not him."

In context, it is clear that the detective merely confirmed to Appleby that Appleby was correct in concluding that the man who bore a resemblance to the gunman was not in fact the gunman. This is not an instance where Appleby identified someone other than Appellant as the gunman and was told by a detective that he (Appleby) had made a mistake. Furthermore, nothing in the record indicates Appleby was told anything about anyone in the lineup before he announced he could not identify anyone in it as the gunman.

■ The second instance of improper suggestiveness, according to Appellant, was that Appleby was told his description of the

---

4. The next-to-last question in the quoted testimony was asked by Appellant's lawyer during cross-examination. The question assumes the detective who presented the lineup to Appleby was James O'Neal. O'Neal testified he did not recall participating in the lineup.

gunman fit Appellant "to a 'T.' " Appellant bases this allegation on Fairless' testimony.

As we have seen, Fairless was present when Appleby described the gunman to investigators October 13, 1990. Fairless told the investigators that the gunman Appleby described was at the store the preceding evening, and gave the investigators Appellant's name. Fairless' testimony:

"Q. Okay. So in front of Mr. Appleby you said to him that Eddie Glessner had been in the store?

A. Yes, sir.

Q. And that Eddie Glessner—that it sounds like the description he was giving, Mr. Appleby was giving, it sounds like Eddie Glessner?

A. To a 'T'.

Q. And you told Mike Appleby that?

A. Yes—well, I told the investigators there, too.

Q. And Mike Appleby was there?

A. Yes."

Appellant emphasizes that ten days after the above conversation, Appleby picked out Appellant's picture from photographs presented by O'Neal. Appellant points out he was the only person in the live lineup whose photograph was among those O'Neal showed Appleby.

While that is true, nothing in the record suggests that when O'Neal showed Appleby the photographs, anyone told Appleby that one of them was of Paula Jager's boyfriend. The record is likewise bare of any indication that Appleby was told one of the photographs was of Eddie Glessner, the man whose name Fairless had given investigators ten days earlier. Finally, the transcript contains no testimony that Appleby, upon identifying Appellant's photograph as a photograph of the gunman, told O'Neal that the gunman was Jager's boyfriend or that the gunman's name was Eddie Glessner.

In sum, the record demonstrates Appleby picked out Appellant's photograph because it portrayed the gunman as Appleby remembered *him*, not because of anything Fairless said ten days earlier. That is confirmed by

Appleby's testimony at the hearing on the motion to suppress:

"Q. And why did you pick this photograph out?

A. Well, like I said, he has a beard and a moustache, and whether it was a beard that morning, you know, it was a growth, and of course on the lineup there was no beard or moustache. And of course he had a hat on the morning of the attempted robbery.

Q. So the photograph here was more close to what you actually saw the morning of the robbery?

A. Yes, sir, it was.

Q. Now, when you were shown this photographic lineup by Detective O'Neal, what did he say to you . . . ?

A. He indicated that they had a photo lineup and wanted to know if I would be willing to go through the photo lineup and see if I could pick out who I thought attempted the robbery. And I said, 'Yeah, that's fine.'

Q. And while you were looking through these, was there any conversation?

A. No, Sir.

. . . .

Q. . . . Your identification today in the courtroom of Mr. Glessner as being the person that attempted this robbery of you, what is that based on?

A. Actually based on seeing him that morning of the attempted robbery.

Q. Out there at your business?

A. Yes, sir . . . .

Q. So what about your identification of him from this photo lineup?

A. That's the first and only time I had seen the photo lineup and I picked him out of the photo lineup.

Q. And why did you pick that photo out?

A. Because he looked like the suspect that was there that morning.

Q. Based on what you had seen out there that morning of the robbery?

A. Yes, sir."

Despite Appleby's testimony, Appellant argues that his conviction should be reversed because the "pretrial identification proce-

dure" in the instant case was "very similar" to that in *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), where the Supreme Court of United States reversed a conviction because the identification procedure violated the accused's constitutional right to due process. 394 U.S. at 444; 89 S.Ct. at 1129.

In *Foster*, a robbery case, the accused was placed in a lineup with two shorter men. The accused was wearing a leather jacket similar to one worn by the robber. The victim was unable to identify the accused as the robber. The accused was then placed in a room with the victim and prosecuting officials. Even then, the victim was unsure. Several days later, the accused was placed in a lineup with four other men, none of whom had been in the first lineup. This time, the victim identified the accused as the robber. The Supreme Court held the procedure "made it all but inevitable that [the victim] would identify [the accused] whether or not he was in fact [the robber]." 394 U.S. at 443; 89 S.Ct. at 1129.

The obvious difference between *Foster* and the instant case is that in *Foster* there was no evidence that the physical appearance of the robber changed between the time of the robbery and the time of the lineup. Here, Appleby testified the gunman "had a beard and moustache growth." Yet, several hours later when the lineup was conducted, Appellant was clean shaven. Accordingly, the officers placed other clean shaven men in the lineup.

Ten days later, Detective O'Neal had obtained a photograph of Appellant wearing a moustache and beard.[5] Accordingly, O'Neal placed the photograph among photographs of other men wearing moustaches and beards. There is no evidence as to the identity of the men who appeared with Appellant in the live lineup, and no evidence that O'Neal had access to photographs of any of them in which they were wearing moustaches and beards. Consequently, in assembling the array of photographs shown Appleby on October 23, 1990, it was inevitable that except for Appel-

lant, O'Neal would have to use photographs of men other than those who had appeared in the live lineup.

In *State v. Stephens*, 708 S.W.2d 345 (Mo. App.S.D.1986), the victim identified the accused's photograph in a five-photograph array. She later identified the accused in a live lineup. This Court held the victim's in-court identification of the accused was admissible even though the accused was the only person in the live lineup whose photograph had appeared in the photograph array. *Id.* at 348[2]. An identical result was reached on identical facts in *State v. Burns*, 581 S.W.2d 590, 594[6] (Mo.App.E.D.1979).

We recognize, of course, that the instant case differs from *Stephens* and *Burns* in that Appleby viewed the live lineup before viewing the photograph array and was unable to identify Appellant in the lineup, but did identify Appellant in the photograph array. However, we fail to see why that requires a result contrary to *Stephens* and *Burns*.

As noted earlier, Appellant's clean shaven appearance at the time of the lineup differed from that of the gunman in that the gunman had facial hair. Obviously, there was nothing impermissibly suggestive in placing Appellant, clean shaven, in a lineup with other clean shaven men. Later, when a photograph of Appellant with facial hair was obtained, we find nothing impermissibly suggestive in placing it in a photograph array of other men with facial hair.

■ The crucial test for admission of identification testimony is twofold: (1) was the pretrial identification procedure impermissibly suggestive, and (2) if so, what impact did the suggestive procedure have upon the reliability of the identification made by the witness. *State v. Hornbuckle*, 769 S.W.2d 89, 93[6] (Mo. banc 1989), *cert. denied*, 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989).

As to issue 1, we have found nothing impermissibly suggestive in the procedures about which Appellant complains in his second point. However, even had there been

5. We glean from the record that the photograph had been made by the Department of Revenue some time before October 13, 1990, in connec-

tion with Appellant's renewal of his driver's license.

impermissible suggestiveness, Appellant's second point would fail because of issue 2.

■ As to issue 2, *Hornbuckle* says the factors to be considered in assessing reliability of a witness' identification of a culprit include the opportunity of the witness to view the culprit at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the culprit, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. 769 S.W.2d at 93[5].

■ Appleby had an excellent opportunity to view the gunman at the time of the encounter. Appleby testified they were five or six feet apart when the encounter began, and it was "clear, early morning daylight." Appleby gave the gunman Appleby's undivided attention during the encounter ("three to five minutes" according to Appleby). Appleby described the gunman to investigators and aided Detective Thorson in constructing the composite likeness. Although Appleby was unable to identify Appellant as the gunman at the live lineup, Appleby unequivocally identified Appellant's photograph ten days later.

■ Appellate review of a trial court's denial of a motion to suppress is limited to a determination of whether sufficient evidence exists to sustain the trial court's ruling. *State v. Wise,* 879 S.W.2d 494, 503[1] (Mo. banc 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). Identification testimony will be excluded only when the procedure was so suggestive that it gave rise to a very substantial likelihood of irreparable misidentification. *Hornbuckle,* 769 S.W.2d at 93[7].

We hold the evidence sufficient to support a finding that Appleby identified Appellant's photograph as a photograph of the gunman because of the facial hair, not because Appellant was the only person in the photograph array who had appeared in the live lineup or because of the other incidents complained of in Appellant's second point. We further hold the evidence sufficient to support a finding that Appleby's in-court identification of Appellant as the gunman was based on Apple-

by's observation of Appellant at the time of the encounter at Woodside Surplus City, not on anything that occurred thereafter. In short, there was no substantial likelihood of irreparable misidentification. Appellant's second point is denied.

We turn now to Appellant's first point. Discussion of it requires a synopsis of Appellant's testimony on direct examination.

Appellant recounted he was cohabiting with Paula Jager when the events in question occurred. Asked about the handgun found during the search of the Ford, Appellant explained Paula bought it "for protection purposes" at a truck stop "on the borderline of Oklahoma–Texas."

The need for protection, according to Appellant, was that there was "hard friction" between him and "some drug dealers." Specifically, said Appellant, at the time of his arrest two individuals who had manufactured methamphetamine in 1989 in Springfield were at large. Appellant added:

"I testified over at the Federal Courthouse in front of the grand jury. And then I believe at the trials, at two trials, if I remember correctly, and those individuals are now, you now, in custody, doing federal time, you know, a significant amount of time."

Later during Appellant's direct examination, this dialogue occurred:

"Q. Do you remember how long it was after you got arrested that you participated in that lineup?

A. When I was arrested I was taken straight to the Greene County Sheriff's Department interrogation room. And at that time they asked me to sign a Miranda rights waiver or whatever.

And I had asked the gentleman on the spot, I asked him what I was doing, and he said, 'Well, you're suspected of a robbery.' And I think I said something like, 'Who did I rob and how much did I get,' or something like that.

And when I got to the Sheriff's Department *I could see they pretty much had it in their mind that I was their guy, so I knew they were making a*

*mistake, so obviously I didn't talk to them."* (Emphasis added.)

Appellant's cross-examination by the prosecutor included this:

"Q. So at the time of your arrest on October 13th of 1990 ... you were a witness for the Drug Enforcement Administration, DEA, right?

A. Yes.... I had been in court.

Q. All right. And you get picked up by some Greene County Sheriff's deputies on what you believe is a bogus charge, is that right?

A. Right.

Q. And you ... didn't talk to Greene County at all, right?
....

A. After they told me what they wanted with me, yes, that's right.... That was at the Greene County Sheriff's Department.

Q. [D]id you not think it was important to say, 'Look, guys, I'm working with the feds, your brothers in law enforcement.' [Appellant's lawyer]: Your Honor, I'm going to object to any reference to whether or not he talked with the police, it's a violation of his constitutional rights to—

[Prosecutor]: He opened the door, Your Honor.

THE COURT: I'll overrule the objection.
....

Q. ... You're a witness for the DEA, you've got to testify for them. So at the time of your arrest on this Saturday, October 13th, you're one of their people. You've got to testify for them.

A. Well, I was no federal agent.... I was basically what they refer to as ... an informant.
....

Q. ... I recognize you were just a witness for them. But here's the question. On that Saturday, October 13th, you were still a witness for them in some cases that were coming up, you're hauled in by Greene County Sheriff's

deputies on a charge that you believe is bogus, and yet you didn't say to them, 'Cut me some slack, call the DEA guys over here and they'll tell you I'm an all right guy?'
....

A. ... I was not a witness prior to that ... okay, in other words I was arrested and then the DEA stuff began, okay? ... [A]s of that day I had not testified."

Appellant's first point asserts the trial court erred in overruling the objection by Appellant's lawyer during the above exchange in that the prosecutor's inquiry "violated Appellant's right to due process of law and privilege against self-incrimination guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, sections 10 and 19 of the Missouri Constitution."

In support of that position, Appellant cites *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), which holds that a prosecutor cannot impeach an accused's exculpatory story, told for the first time at trial, by cross-examining the accused about his failure to tell the story after receiving *Miranda* warnings [6] at the time of arrest.

There is a crucial difference between *Doyle* and the instant case. Here, Appellant himself, on direct examination, told the jury why he said nothing to the officers after the *Miranda* warnings. Appellant explained he could see the officers were convinced he was the culprit so he "didn't talk to them."

When the prosecutor, on cross-examination, asked Appellant why he remained silent instead of telling the authorities he was a witness for the Drug Enforcement Administration, the prosecutor was asking about two matters as to which Appellant testified on direct examination: Appellant's role in the federal drug case and his silence at time of arrest.

Section 546.260.1, RSMo 1994, reads:

"... no person on trial ... shall be required to testify, but any such person may testify at his ... option ..., and shall be liable to cross-examination, as to any

**6.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

matter referred to in his examination in chief...."

■ In cross-examination of an accused who testifies in his own behalf, the prosecution is not confined to a categorical review of the evidence given by the accused on direct examination, but may examine him in detail as to matters generally referred to in his examination in chief. *State v. Murphy*, 592 S.W.2d 727, 731[4] (Mo. banc 1979). Accordingly, if in direct examination an accused refers in a general way to a subject, he may be cross-examined in detail on that subject. *Id.*

In *Doyle*, 426 U.S. 610, 96 S.Ct. 2240, relied on by Appellant, the accused did not, on direct examination, say anything about his silence following the *Miranda* warnings. Consequently, *Doyle* does not address the issue here, i.e., the extent of permissible cross-examination on a matter referred to by the accused on direct examination.

In *State v. Mathenia*, 702 S.W.2d 840 (Mo. banc 1986), *cert. denied*, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986), also cited by Appellant, the accused did not testify, hence that case, like *Doyle*, supplies no guidance. Indeed, Appellant cites no case where the accused, on direct examination, told a jury the reason for his post-*Miranda* silence and thereafter claimed on appeal that it was error for the prosecutor to cross-examine him on the subject.

In choosing to testify, Appellant faced a dilemma analogous to that of the accused in *State v. Storey*, 901 S.W.2d 886 (Mo. banc 1995). There, the accused, at time of arrest, made some incriminating statements which the prosecution introduced in evidence during its case-in-chief. *Id.* at 898. The accused testified later in the trial, recounting facts which he had not revealed to the investigators. *Id.* at 898–99. The new facts tended to explain away the incriminating statements. *Id.*

The accused's lawyer in *Storey* elicited testimony from the accused that he had invoked his right to counsel during the custodial interrogation. In seeking post-conviction relief, the accused maintained his lawyer ren-

dered ineffective assistance in that regard. The Supreme Court of Missouri held:

"An obvious question about [the accused's] trial testimony is: Why didn't he tell the police about the [exculpatory facts]? Counsel's decision to elicit early the answer—that the police interview was incomplete because [the accused] asked for a lawyer—was reasonable, especially since the defense had already told the jury that [the accused] would testify.

On this record, counsel made a reasonable strategic decision to inform the jury that the police interview was interrupted by [the accused's] invoking the right to counsel, because it was crucial that the jury know *why* [the accused] did not tell the police about the exculpatory evidence. Counsel testified at the 29.15 hearing that she recognized the possible prejudice, but made a 'judgment call' that the benefits outweighed the prejudice. A strategic 'judgment call' is not ineffective assistance.

[The accused] also argues that trial counsel should have objected when the prosecutor in cross-examination mentioned that [the accused] invoked his rights. The reference was brief, and [the accused] had opened the door. Thus, there was no prejudice."

*Id.* at 899[46] and [47].

■ Here, Appellant's lawyer, in opening statement, told the jury Appellant would testify he "did not rob Steven Appleby." During direct examination, Appellant presented an explanation for the presence of the gun in the Ford's trunk, telling the jury Paula Jager bought it for protection because of Appellant's role as an informant and witness against two drug dealers in a federal prosecution. Evidently, Appellant was concerned that the jurors would be skeptical about the explanation because he had not presented it to the officers at time of arrest. Consequently, on direct examination Appellant explained he told the officers nothing because it was apparent they were convinced he was the gunman.

Appellant thus placed himself in the same position as the accused in *Storey*, presenting exculpatory testimony on direct examination and explaining later on direct examination

why he did not reveal such facts at time of arrest. We hold, as did the Supreme Court in *Storey,* that Appellant "opened the door."

 The extent of cross-examination of an accused rests within the discretion of the trial court, and an appellate court will not interfere unless that discretion is clearly abused. *State v. Hoopingarner,* 845 S.W.2d 89, 94[15] (Mo.App.E.D.1993); *State v. Hill,* 823 S.W.2d 98, 102 (Mo.App.E.D.1991); *State v. Manns,* 745 S.W.2d 768, 774 (Mo.App.S.D. 1988). As observed in *Manns,* § 546.260 and the cases construing it do not furnish any yardstick by which an appellate court can accurately measure the breadth of cross-examination and tell clearly whether its proper scope has been infringed; it is probably impossible to lay down any definite rule, hence each case is very much dependent on its own facts and background. 745 S.W.2d at 774, *citing State v. Scown,* 312 S.W.2d 782, 786[1] (Mo.1958).

 To establish an abuse of discretion, an accused must show that reasonable persons could not differ as to the propriety of the action of the trial court. *State v. Clements,* 849 S.W.2d 640, 643[2] (Mo.App.S.D. 1993); *State v. Jimerson,* 820 S.W.2d 500, 502 (Mo.App.W.D.1991). Measured by that standard, and mindful that an accused cannot complain about cross-examination as to matters first brought into the case by the accused's testimony on direct examination, *State v. Thomas,* 820 S.W.2d 538, 545[13] (Mo.App.W.D.1991); *State v. Schlup,* 785 S.W.2d 796, 801[10] (Mo.App.W.D.1990), we cannot convict the trial court of abusing its discretion in the instance complained of by Appellant's first point.

Judgment affirmed.

## Appeal 20075

The two remaining points in Appellant's brief pertain to this appeal. Each avers the motion court erred in denying relief in that Appellant received ineffective assistance from the lawyer who represented him at trial ("defense counsel").

We first address Point III, which alleges defense counsel was derelict in failing to "adequately investigate and interview Edgar Max Glessner, Sue Glessner, and Junior Allie."

Edgar Max Glessner is Appellant's father. Sue Glessner is Appellant's mother. Junior Allie is Appellant's uncle. We henceforth refer to them individually as "Max," "Sue," and "Allie," respectively. We do so for brevity and clarity, intending no disrespect.

Appellant argues that Max, Sue and Allie were willing to testify he "was clean shaven on the evening before the early morning robbery attempt." Consequently, says Appellant, their testimony "would directly contradict the state's evidence that [Appellant] was seen wearing a beard growth on the prior evening, and cast heavy doubt on Appleby's assertion that a bearded [Appellant] was the man who tried to rob him."

Appellant called defense counsel as a witness in the motion court. Defense counsel testified he had no way of proving Appellant was cleanly shaven on Friday, October 12, 1990.

Asked about a memorandum regarding a phone call from Max on January 10, 1991,[7] defense counsel responded that he had no memory of it but he did talk to Max several times before trial "about the issue of beard or growth," and also in regard to when Max had last seen Appellant before October 13, 1990. Defense counsel avowed Max "wasn't able to be specific about this." Continuing, defense counsel testified:

"[Max and Sue] lived in Aurora and [Appellant] lived in Springfield and it was unclear how many days ... it had been since they had actually seen [him]. And so, as I recall, they were unable to state for sure the nature of his stubble or growth on ... the morning of the robbery or the day before.... They didn't know how many days it had been since [Appellant] had shaved."

---

**7.** The memorandum was received in evidence at the evidentiary hearing in the motion court but has not been filed with us.

Shown a list of names including Allie, defense counsel recalled: "[N]o one that I know of out of this list was able to definitively say what was the state of [Appellant's] facial growth on the morning of or day before the robbery."

The motion court found, *inter alia:*

"The Court finds that [defense] counsel was not ineffective in failing to call witnesses to testify that Movant did not have a beard or stubble at the time of the attempted robbery. [Defense] counsel testified that Movant did not have any witnesses who could say when Movant had last shaved. Edgar M. Glessner, Carol Sue Glessner and [Junior] Allie could not say whether Movant was clean-shaven at the time the robbery attempt took place."

■ Appellant concedes our review of the motion court's findings is limited to a determination of whether they are clearly erroneous.[8] *State v. White,* 798 S.W.2d 694, 697[6] (Mo. banc 1990). However, Appellant insists the motion court's findings as to Max, Sue and Allie are clearly erroneous in that each of them testified in the motion court that Appellant had no moustache or stubble on October 12, 1990.

■ The answer to Appellant's contention is that the motion court was not obliged to believe Max, Sue or Allie. Credibility of witnesses in a post-conviction proceeding is for the motion court's determination. *State v. Duckett,* 849 S.W.2d 300, 306[8] (Mo.App.S.D.1993); *State v. Tubbs,* 806 S.W.2d 746, 749[8] (Mo.App.S.D.1991). The motion court can disbelieve testimony even where uncontradicted. *Duckett,* 849 S.W.2d at 306[8]; *Gresham v. State,* 813 S.W.2d 120 (Mo.App.S.D.1991).

■ Here, the motion court's findings, quoted *supra,* demonstrate the motion court believed defense counsel, not Max, Sue and Allie. That was the motion court's prerogative. We defer to the motion court's superior opportunity to judge credibility. *State v. Twenter,* 818 S.W.2d 628, 635[8] (Mo. banc 1991). Accordingly, we hold the motion court did not clearly err in rejecting Appel-

lant's claim that defense counsel rendered ineffective assistance in failing to "adequately investigate and interview" Max, Sue and Allie.

Appellant presents another claim of error in Point III, averring defense counsel rendered ineffective assistance in failing to "view and properly interpret the composite drawing of the suspect." According to Appellant, the motion court erred in failing to grant post-conviction relief on that ground.

■ The State correctly points out that Appellant did not present this claim in the motion court. A claim of ineffective assistance of counsel raised for the first time on appeal following a motion court's denial of post-conviction relief is procedurally barred. *State v. Gray,* 887 S.W.2d 369, 386[40] (Mo. banc 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995).

Point IV, Appellant's final point, also presents a claim of ineffective assistance of counsel that was not raised in the motion court. The claim is barred by *Gray,* 887 S.W.2d at 386[40].

Judgment affirmed.

SHRUM, C.J., and PARRISH, J., concur.

---

8. This standard of review is spelled out in paragraph "(k)" of the version of Rule 29.15 which took effect January 1, 1996. It appears in identical language in paragraph "(j)" of the version of Rule 29.15 that was in effect in 1994 when Appellant commenced this post-conviction action.